986 P.2d 262 (1999)
In the Matter of the Application for WATER RIGHTS OF PARK COUNTY SPORTSMEN'S RANCH LLP, in Park County,
Park County Sportsmen's Ranch LLP, Appellant,
v.
Frida BARGAS as Trustee of the Frieda Wahl Trust, Ruth Bartle, Jim Campbell, Indian Mountain Corp., James T. Benes, James T. Benes, Jr. and Cassandra L. Benes Trust, Tarryall Land and Cattle LLC, Centennial Water and Sanitation District, Bob Burch, Central Colorado Cattlemen's Association, City and County of Denver, City of Englewood, City of Thornton, H.D. and Mary Catherine Coleman, James E. Copanos, County of Park, Upper South Platte Water Conservancy District, Kim Magness and Gary Magness as Personal Representatives of the Estate of Bob Magness, Darrell Johns, John Johns, David Johns, Joseph G. and Joyce C. Minke, Park County Water Preservation Coalition, Carol Hack, Larry Dirks, Cynthia and Wilbur Van Wagenen, Elkhorn Ranch Homeowner's Association, Colorado Wildlife Commission and Division of Wildlife, Union Pacific Resources Company, and the United States of America, Appellees, and,
State Engineer Harold D. Simpson, and Division Engineer Richard L. Stenzel, Appellees pursuant to C.A.R. 1(e).
No. 98SA208.
Supreme Court of Colorado, En Banc.
September 13, 1999.
As Modified on Denial of Rehearing October 4, 1999.
*263 Bennington Johnson & Reeve, a Professional Corporation, Kenneth J. Burke, Denver, Colorado, Attorneys for Appellant.
Bernard, Lyons & Gaddis, a Professional Corporation, Jeffrey J. Kahn, Steven P. Jeffers, Longmont, Colorado, Attorneys for Park County and Upper South Platte Water Conservancy District.
Fairfield and Woods, P.C., Stephen H. Leonhardt, Ilona L. Dotterrer, Denver, Colorado, Attorneys for the Frieda Wahl Trust.
Felt, Houghton & Monson, LLC, James G. Felt, James W. Culichia, Colorado Springs, Colorado, Attorneys for Park County Water Preservation, Carol Hack, Larry Dirks, Cynthia and Wilber Van Wagenen and Elkhorn Ranch.
Vranesh and Raisch, LLC, Michael D. Shimmin, Boulder, Colorado, Attorneys for H.D. and Mary Catherine Coleman.
*264 United State Department of Interior, Rocky Mountain Region, John R. Kunz, Special Assistant U.S. Attorney, Lakewood, Colorado, Attorneys for the United States of America.
Holly I. Holder, P.C., Holly I. Holder, Diana A. Cachey, Priscilla S. Fulmer, Denver, Colorado, Attorneys for Jim Campbell and Indian Mountain Corp.
Moses, Wittemyer, Harrison and Woodruff, P.C., David L. Harrison, Veronica A. Sperling, Gilbert Y. Marchand, Jr., Boulder, Colorado, Attorneys for Centennial Water, James T. Benes,James T. Benes, Jr. and Cassandra L. Benes Trust,and Tarryall Land and Cattle.
Office of the City Attorney, Evan D. Ela, Thornton, Colorado, Attorneys for the City of Thornton.
Friedlob Sanderson Raskin Paulson & Tourtillott, LLC, Brian M. Nazarenus, Carolyn F. Burr, Denver, Colorado, Attorneys for Union Pacific Resources Company.
Office of the State Attorney General, Ken Salazar, Attorney General, Barbara McDonnell, Chief Deputy Attorney General, Michael E. McLachlan, Solicitor General, Joseph C. Smith, Jr., Deputy Attorney General, Lee E. Miller, First Assistant Attorney General, Edward R. Kowalski, Assistant Attorney General, Natural Resources Section, Denver, Colorado, Attorneys for State Engineer and the Division Engineer for Water Division 1.
Justice KOURLIS delivered the Opinion of the Court.
This case requires us to determine whether certain provisions of the Colorado Ground Water Management Act (CGWMA), see §§ 37-90-101 to 143, 10 C.R.S. (1998), apply to the Laramie-Fox Hills aquifer located outside of the Denver Basin in South Park, Colorado. The provisions in question, contained in subsections (10.5) and (10.7) of section 37-90-103, operate to allow certain water that would otherwise be deemed to be tributary water subject only to appropriative use to be withdrawn as ground water under section 37-90-137 of the CGWMA. After examining legislative history to resolve ambiguities in the statute, we conclude that subsections (10.5) and (10.7) apply only in the Denver Basin, and not to the South Park ground water at issue in this case.

I.
Appellant Park County Sportsmen's Ranch LLP (PCSR) is the agent in fact of the City of Aurora, which owns 2,307 acres of land in South Park, Colorado overlying an estimated 44,986 acre feet of ground water. The water is contained in a formation of the Laramie-Fox Hills aquifer. In 1992, PCSR received three well permits allowing it to withdraw an average annual total of 450 acre feet of ground water. However PCSR never constructed the wells, and its permits expired on June 30, 1997.
Before the expiration of the permits, on January 29, 1996, PCSR applied to the Division I Water Court for a decree to confirm PCSR's continued right to withdraw ground water in accordance with the terms of the three permits. The Appellees filed in opposition to the PCSR's application, and the water court set the matter for trial.
As contemplated in section 37-92-302(2), 10 C.R.S. (1998), on June 4, 1996, the Office of the State Engineer (State Engineer) then filed with the water court the first in a series of three determinations of fact concerning PCSR's decree application. Relying on its 1992 well permit studies, the State Engineer found that PCSR's ground waters were "nontributary" to any surface waters. Several Appellees subsequently requested that the State Engineer reevaluate this finding based on new information concerning the extent of contact between the aquifer and alluvial surface waters underlying Tarryall Creek.
After conducting additional investigations, the State Engineer issued a second amended determination of fact on August 7, 1997. It found that, because there was stream-aquifer contact along 3,500 feet of Tarryall Creek: (1) the ground water underlying that portion of PCSR's lands was "not nontributary" as defined by subsection (10.7), because withdrawals would, within 100 years, deplete the flow of Tarryall Creek at an annual rate of greater than one-tenth of one percent of the annual rate of withdrawal, but that (2) the *265 ground water underlying the remainder of PCSR's lands was "nontributary" as defined by subsection (10.5), because withdrawal of that water would not deplete the Creek by one-tenth of one percent of withdrawals within 100 years.
Several Appellees then filed a motion pursuant to C.R.C.P. 56(h), requesting that the water court determine as a matter of law whether subsection (10.7) and certain provisions in subsection (10.5) were applicable to ground water in the Laramie-Fox Hills aquifer in South Park. After considering extensive briefs by the parties, filings by the State Engineer, and legislative history, the water court ruled that the relevant provisions in subsections (10.5) and (10.7) were ambiguous as to whether their references to the "Denver, Dawson, Arapahoe, and Laramie-Fox Hills aquifers" applied to those aquifers outside the Denver Basin. However, the court concluded that legislative history resolved this ambiguity by demonstrating that the General Assembly intended to refer to the four aquifers only at their locations in the Denver Basin, not to other formations of these aquifers outside the Denver Basin. Noting that all parties conceded that the water in question was tributary absent the contested provisions of subsection (10.5) and (10.7), the water court further ruled that "all out-of-priority pumping would require replacement or augmentation for 100% of out-of-priority withdrawals."[1]
Because pursuant to the water court's ruling, PCSR could no longer prevail on its claim to ground water rights under the CGWMA, PCSR then moved for entry of a final judgment concerning the water court's interpretation of sections 37-90-103(10.5) and (10.7). The water court issued such a judgment on April 6, 1998, finding that there was no nontributary ground water under PSCR's lands and this appeal followed.[2]
PCSR now contends that the water court's holding that subsections (10.5) and (10.7) do not apply to PCSR's ground water was erroneous based on the clear and express language of those subsections. In addition, PCSR contends that even if the water court was correct and PCSR's ground water is tributary, the water court erred by holding that PCSR must augment or replace 100% of its out-of-priority diversions.[3]

II.
In Colorado, ground water that is hydrologically connected to a surface stream is generally considered "tributary" and is subject to the constitutional doctrine of prior appropriation.[4] Priority for purposes of administration among respective users is a function of the "appropriation date"  or the date that the appropriator first formed the intent to divert the water to beneficial use and began overt work toward that end[5]  and the adjudication date.[6] In contrast, ground water that is either not hydrologically connected or is minimally connected to any *266 surface stream is considered "nontributary"[7] and does not fall within the doctrine of prior appropriation, but rather is subject to administration and allocation as the General Assembly sees fit.[8]
In Senate Bill 5, ch. 285, 1985 Colo. Sess. Laws 1160 (codified as amended in scattered sections of Title 37, 10 C.R.S. (1998)), the General Assembly adopted a statutory system for administering and allocating nontributary ground water that affords owners of lands overlying aquifers the right to withdraw ground water at a rate designed to provide the aquifer with at least a 100 year life expectancy. This system is fundamentally different from the prior appropriation doctrine applicable to tributary waters. Whereas the usufructuary right to surface water is based upon a diversion of a specific quantity of water to a beneficial use with prior diversions prevailing over latter ones,[9] the right to withdraw nontributary ground water is based by operation of statute upon overlying land ownership with no diversion requirement and with available quantity determined by a 100 year aquifer life expectancy.[10]
Section 37-90-103(10.5) sets forth the criteria for ascertaining whether a given nondesignated[11] ground water formation is hydrologically connected to surface waters or whether it is instead nontributary:
(10.5) "Nontributary ground water" means that [sic] ground water, located outside the boundaries of any designated ground water basins in existence on January 1, 1985, the withdrawal of which will not, within one hundred years, deplete the flow of a natural stream ... at an annual rate greater than one-tenth of one percent of the annual rate of withdrawal.
§ 37-90-103(10.5). This rule applies to nondesignated ground water throughout the state. However, observing the "great economic importance" of the Dawson, Denver, Arapahoe, and Laramie-Fox Hills aquifers, the General Assembly in subsections (10.5) and (10.7) created two modifications to this rule.
First, under subsection (10.5), enacted in 1985, ground water in those four enumerated aquifers is subject to a relaxed standard for determining its tributary character, and thus may be deemed "nontributary" even though its withdrawal does not fall below the normal one-tenth of one percent stream depletion requirement. See § 37-90-103(10.5). Specifically, the statute states:
[I]n recognition of the de minimis amount of water discharging from the Dawson, Denver, Arapahoe, and Laramie-Fox Hills aquifers into surface streams due to artesian pressure, when compared with the great economic importance of the ground water in those aquifers, and the feasibility and requirement of full augmentation by wells located in the tributary portions of those aquifers, it is specifically found and declared that, in determining whether ground water of the Dawson, Denver, Arapahoe, and Laramie-Fox Hills aquifers is nontributary, it shall be assumed that the hydrostatic pressure level in each such aquifer has been lowered at least to the top of that aquifer throughout that aquifer.
§ 37-90-103(10.5). In Danielson v. Castle Meadows, Inc., 791 P.2d 1106 (Colo.1990), we observed that the "hydrostatic pressure level of an aquifer at a particular location is the *267 height to which water will rise in a well at that location. If the hydrostatic pressure level is at the top of the aquifer or below, the aquifer is not under artesian conditions." Id. at 1111 n. 5. Rather, such aquifers are said to be under water table conditions.
In effect, then, the so-called "hydrostatic pressure assumption" in section 37-90-103(10.5) simply prevents the four named aquifers from being considered tributary merely because their hydrostatic pressure causes them to "overflow" into surface waters. Rather, the State Engineer and the courts assume that the top of the aquifer is under water table conditions when determining the amount of nontributary water available for withdrawal.[12]
However, this relaxed standard for determining tributariness is offset by an augmentation provision that allows the State Engineer to require users of nontributary ground water to relinquish up to two percent of the water they withdraw in order to avoid material injury to vested surface water rights. See § 37-90-137(9)(b). The State Engineer has promulgated such rules, but they apply only to the Denver Basin. See Denver Basin Rules, 2 C.C.R. § 402-6.
The second modification to the general rule of tributariness is found in subsection (10.7), which the General Assembly enacted in 1996, eleven years after subsection (10.5). Under subsection (10.7), ground water in the four enumerated aquifers that, despite the relaxed standard for determining tributariness in subsection (10.5), still exceeds the one-tenth of one percent stream depletion requirement is called "not nontributary" ground water:
"Not nontributary groundwater" means ground water located within those portions of the Dawson, Denver, Arapahoe, and Laramie-Fox Hills aquifers that are outside the boundaries of any designated ground water basin in existence on January 1, 1985, the withdrawal of which will, within one hundred years, deplete the flow of a natural stream ... at an annual rate of greater than one-tenth of one percent of the annual rate of withdrawal.
§ 37-90-103(10.7). Thus, absent the statute, this water would be tributary and subject to administration under the Water Right Determination and Administration Act of 1969, see §§ 37-92-101 to -602, 10 C.R.S. (1999).
Under the CGWMA, owners of lands overlying "not nontributary" ground water may still withdraw that water. However, in order to avoid injurious effects on surface water rights, § 37-90-137(9)(c)(I) specifically requires that such wells completed into the Dawson aquifer shall be required to replace actual stream depletions to the extent necessary to prevent any injurious effect, based upon actual aquifer conditions in existence at the time of such decree. In addition, users of wells into the "not nontributary" ground water of the Denver, Arapahoe, or Laramie-Fox Hills Aquifers must replace four percent of their annual withdrawals to the affected stream if they are more that one mile from the connection between the aquifer and the stream. See § 37-90-137 (9)(c)(I). If wells into "not nontributary" ground water of the Denver, Arapahoe, or Laramie-Fox Hills Aquifers are within one mile of the stream contact point, they must augment actual injurious depletions using the assumption that the hydrostatic pressure level in each such aquifer has been lowered at least to the top of the aquifer throughout that aquifer.[13] Thus, depending on the facts of each case, *268 the augmentation requirements in the four enumerated aquifers for "not nontributary" water may be as stringent, less stringent, or even more stringent, than the augmentation requirements that would apply to out-of-priority diversions under prior appropriation doctrine administration.[14]
In this case, as the State Engineer's second and third amended determinations of fact demonstrate, the ground water in question was tributary when considered without the hydrostatic pressure assumption and the "not nontributary" classification of subsections (10.5) and (10.7). Thus, the water was subject to the doctrine of prior appropriation. However, if considered in light of those two subsections, the ground water would be partially nontributary and partially "not nontributary". As such, PCSR would be entitled to withdraw one percent of the total ground water under its property each year. Furthermore, with respect to the nontributary ground water, PCSR would not be subject to the Denver Basin augmentation rules because of the geographic limitations of those Rules. See Denver Basin Rules, 2 C.C.R. § 402-6. With this background in mind, we now analyze whether subsections (10.5) and (10.7) apply outside of the Denver Basin.

III.
In addressing this question, we must ascertain the intent of the legislature when it enacted the two subsections and "adopt the statutory construction that best effectuates the purposes of the legislative scheme." M.S. v. People, 812 P.2d 632, 635 (Colo.1991); see also People v. Baer, 973 P.2d 1225, 1228 (Colo.1999). In determining legislative intent, we look first to the plain and ordinary meaning of the statute. See Christie v. Coors Transp. Co., 933 P.2d 1330, 1332 (Colo.1997); see also § 2-4-101, 1 C.R.S. (1998) (stating that "[w]ords and phrases shall be read in context and construed according to ... common usage" and that "[w]ords and phrases that have acquired a technical or particular meaning whether by legislative definition or otherwise, shall be construed accordingly"). However, if a statute is ambiguous because it is "reasonably susceptible to more than one meaning," we may consider among other factors the object the legislature sought to obtain by its enactment, the circumstances under which it was adopted, the legislative history of the statute, and the legislative declaration or purpose. See § 2-4-203, 1 C.R.S. (1998); see also State Eng'r v. Castle Meadows, Inc., 856 P.2d 496, 505 (Colo.1993). We presume throughout that the General Assembly intended a just and reasonable result and that it favored the public interest over any private interest. See § 2-4-101, 1 C.R.S. (1998).
Here, the General Assembly declared in 1985 that it adopted the hydrostatic pressure assumption in subsection (10.5) "in recognition of the de minimis amount of water discharging from the Dawson, Denver, Arapahoe, and Laramie-Fox Hills aquifers into surface streams due to artesian pressure, when compared with the great economic importance of the ground water in those aquifers." § 37-90-103(10.5). The General Assembly further justified its adoption of the assumption by acknowledging "the feasibility and requirement of full augmentation by wells located in the tributary portions of those aquifers." Id.
These declarations are consistent with the General Assembly's understanding of the four enumerated aquifers at the time the *269 Assembly enacted section 37-90-103(10.5). At that time, members of the General Assembly were aware that, due to hydrostatic pressure, the four aquifers at their locations in the Denver Basin were discharging approximately 39,600 acre feet per year into the surface waters of the South Platte River basin, whereas the four Denver Basin aquifers contained a total of nearly 75 million acre feet of ground water. In addition, legislators were aware that over 2,500 wells were withdrawing water from the Dawson, Arapahoe, Denver, and Laramie-Fox Hills aquifers in the Denver Basin, and that the Denver metropolitan area was growing rapidly. All of these factual assertions are well-documented in the testimony provided to the General Assembly in connection with consideration of the statutes.
In contrast, no factual representations concerning the geographic extent, hydrological conditions, or the total amount of water contained in the formation of the Laramie-Fox Hills aquifer in South Park, Colorado appear in the legislative history. Indeed, the water court found that the formation was "virtually untapped" in 1985. The General Assembly knew very little about the aquifers outside of the Denver Basin.
Because the subsection refers on the one hand to the "great economic importance" and "de minimis" discharge of the named aquifers, and on the other hand to the four aquifers without geographical limitation, we find the General Assembly's reference to the four aquifers to be ambiguous. The first reference appears to relate specifically to the Denver Basin, whereas, the broader reference to the aquifers appears to relate to those aquifers wherever they may be found. The statute is inherently ambiguous because it is unclear whether the reference applies only to formations of those aquifers located in the Denver Basin, or whether it applies to formations of the four named aquifers located elsewhere in the state. We therefore must look to other factors to determine the General Assembly's intent in enumerating the four aquifers.

IV.
It is helpful in this regard to address first the legislative history of section 37-90-103(10.5), which was enacted eleven years prior to subsection (10.7). Subsection (10.5) was enacted as part of Senate Bill 5, ch. 285, sec. 3, § 37-90-103(10.5), 1985 Colo. Sess. Laws 1160, 1161, following our decision in State v. Southwestern Colo. Water Conservation Dist., 671 P.2d 1294 (Colo.1983) (Huston II).[15]
In Huston II, we held that the nontributary ground waters of this state were not subject to the constitutional right to prior appropriation under the Colorado Constitution Article XVI, Sections 5 and 6. See Huston II, 671 P.2d at 1308. Rather, we held that the administration and allocation of nontributary ground water is subject to the plenary control of the General Assembly. See id. at 1319; see also Bayou Land, 924 P.2d at 147. We noted in this regard that Colorado's "law governing nontributary ground water has developed more slowly than that with respect to tributary water." Huston II, 671 P.2d at 1311.
In fact, at the time we decided Huston II, the use of nondesignated nontributary waters fell under the sole control of the State Engineer through a well permit system.[16] Judicial *270 jurisdiction over such water extended only to the determination of whether the water was in fact nontributary; the courts had no jurisdiction over the permit application process itself. See id. at 1309-11, 1314-15; see also § 37-90-137(4), 15 C.R.S. (1982 Supp.) (establishing a permit system for nontributary ground water).

a.
Three months after our initial decision in Huston II, the General Assembly passed Senate Bill 439, ch. 516, sec. 1, §§ 37-90-203, -137(6), 1983 Sess. Laws 2079-80, affording jurisdiction over nontributary ground water to the water courts. In October 1983, Governor Richard Lamm signed that bill into law, but directed the Department of Natural Resources to initiate a study to evaluate alternative approaches to administering Colorado's groundwater in a more comprehensive manner. See Colorado Legislative Council, Recommendations for 1985 Committee on: Nontributary Ground Water app. A (1984) (Research Pub. 292). To this end, the Department established the Ground Water Legislation Committee (the Getches Committee), chaired by the Department's Executive Director, David Getches. See id. The Getches Committee submitted its final report to the Colorado Legislative Council's Interim Committee on Nontributary Ground Water, chaired by Senator Tilman Bishop (the Bishop Committee). The Bishop Committee in turn submitted the Getches Committee Report and a proposed ground water bill to the General Assembly in December 1984. See id. at 5 & App. B.
Among numerous other revisions, the Bishop Committee's proposed ground water bill recommended that the General Assembly add a new subsection (10.5) to section 37-90-103 defining non-tributary ground water as water that:
if diverted, will not, within one hundred years ... affect the flow of a natural stream in an annual amount greater than one percent of the annual amount allowed to be diverted. The general assembly finds and determines that "nontributary ground water" includes all ground water within the Denver, Arapahoe, and Laramie-Fox Hills formations and that the diversion of ground water from those formations will not materially affect vested water rights to the flow of any natural stream.
Recommendations for 1985 Committee on: Nontributary Ground Water (1984) at 17. Thus, the Bishop Committee recommended an approach that would categorize waters in the Denver, Arapahoe, and Laramie-Fox Hills formations as per se nontributary.
The Reports of the Getches and Bishop Committees clearly indicate the committees' intent that this proposed definition of the Dawson, Denver, Arapahoe, and Laramie-Fox Hills aquifers as per se nontributary should apply to those aquifers only in the Denver Basin. Both reports used "Denver Basin" and the enumeration of the four aquifers interchangeably, and neither report made any indication that any of the enumerated aquifers existed outside of the Denver Basin.
In fact, the Getches Committee explained that it was opposed to broad rules applicable statewide. It wrote:
The Committee opposes the application of a uniform system that is applicable to all areas of the state. The committee strongly recommends allocation and administration of nontributary ground water according to the characteristics of the area of use....
The committee recommends that because of the special characteristics of the Denver Basin and the presumed demands for ground water along the front range, that the Denver Basin (Dawson-Arkose, Denver, Arapahoe, Laramie-Fox Hills) should be administered consistent with those conditions. The Committee was evenly split on the desirability of continuing to apply existing law (S.B.213) in the Denver Basin, but most felt if the law were changed to provide a means of dealing with partially tributary groundwater, existing law would be adequate. The Committee is not satisfied that only such minor changes would be adequate for all aquifers in the *271 state, such as those west of the Continental Divide or in the San Luis Valley.
Id. app. A at 21 (quoting Report of Groundwater Legislation Committee, (1984)) (emphasis added).
The Bishop Committee Report indicated that the Bishop Committee gave "particular emphasis" to four topics, one of which was the Denver Basin. See id. at 6. As to that basin, the Report noted: "The Denver Basin is comprised of four aquifers  the Dawson-Arkose, the Denver, the Arapahoe, and the Laramie-Fox Hills. The approximate geographic boundaries of the basin are the foothills, Greeley, Limon, and Fountain." Id. at 7. Thus, quite early in the legislative process, individuals identified the need to address concerns specific to the Denver Basin, and equated the Dawson, Denver, Arapahoe, and Laramie-Fox Hills aquifers with the Denver Basin.

b.
The recommendations of the Getches and Bishop Committees formed the basis of Senate Bill 5, which the General Assembly eventually enacted with a nontributary definition as set out in section 37-90-103(10.5). The first legislative committee to consider Senate Bill 5 was the Senate Committee on Agriculture, Natural Resources, and Energy (Senate Agriculture Committee), again chaired by Senator Bishop. See Hearing on SB 5 Before the Senate Committee on Agriculture, Natural Resources, and Energy, 51st General Assembly, 1st Reg. Sess. (Jan. 24, 1985). In that hearing, Senator Bishop introduced the Bill to the senators, explaining that the Bishop Committee had
talked about whether or not legislation should address non-tributary ground water, basin by basin, or aquifer by aquifer, recognizing that there are differences and uniquenesses in the state of Colorado that may not apply to the state as a whole....
And that's something that we may want to look at. I know that what might be a Denver Water Basin concern, and what we may want to go into the statutes, may not be the statement we would want to set for El Paso County, or for Western Colorado, or northeastern, or southeastern part of the state.
Id. Thus, the senators were aware that different hydrological formations in different areas of the state might require distinct administration. At the Senate Agriculture Committee's next hearing on Senate Bill 5, on March 8, 1985, Senator Bishop invited Charles Elliott, an attorney representing the Colorado Water Congress, to explain portions of the proposed Senate Bill 5 to the Committee. Mr. Elliott read the first part of subsection (10.5) defining nontributary water and then stated:
The definition goes on to talk about some specifics, and I don't think I need to read it to you. But we are recognizing that at a time ____ that certain particular aquifers in the Denver Basin have particular characteristics. They are named in the definition.

Hearing on SB 5 Before the Senate Committee on Agriculture, Natural Resources, and Energy, 51st General Assembly, 1st Reg. Sess. (Mar. 7, 1985) (emphasis added). Later that day, Deputy State Engineer Hal Simpson explained the effect of the hydrostatic pressure assumption in the nontributary ground water definition:
In particular, the insertion of the statement that the Dawson, Denver, Arapahoe, and Laramie-Fox Hills aquifers, that we are to ignore the artesian pressure when they're evaluating the impact of the new well permits in the basin, basically that is going to create, it appears, a potential loss of somewhere around 40,000 acre feet a year of water now discharging into the South Platte River and into some of the tributaries of the Arkansas Basin.
Id.
Elliott and Simpson's statements corroborate what appears clear from all of the Senate hearings: that the designation of the Dawson, Denver, Arapahoe, and Laramie-Fox Hills aquifers in subsection (10.5) was designed to modify the definition of nontributary for purposes of the Denver Basin only. The senators understood that this modification would result in the loss of approximately 40,000 acre feet of ground water then discharging from the four enumerated aquifers, *272 because the hydrostatic head of those aquifers would be disregarded in determining whether they were nontributary. However, they also understood that Senate Bill 5 accounted for this loss by requiring augmentation from the four aquifers back into the Denver Basin to an extent that would sufficiently offset the loss of the hydrostatic overflow, which in the Denver Basin formations of the four enumerated aquifers was approximately 40,000 acre feet per year. There is no indication anywhere in the legislative record that any senators were aware of the existence of the South Park formation of the Laramie-Fox Hills aquifer. Moreover, they had no knowledge concerning the amount of hydrostatic overflow occurring in that formation or the amount of augmentation that would be necessary to avoid injury to senior surface water rights in proximity to that formation.

c.
An examination of the history of Senate Bill 5 in the House leads to similar conclusions. In that chamber, the Chairman of the House Committee of Agriculture, Livestock, and Natural Resources (House Agriculture Committee), Representative Walt Younglund, asked David Harrison, a prominent Colorado water attorney, to address certain aspects of the draft of Senate Bill 5 before that committee. See Hearing on SB 5 Before the House Committee on Agriculture, Livestock, and Natural Resources, 51st General Assembly, 1st Reg. Sess. (May 8, 1985). Mr. Harrison explained the nontributary definition to the Committee, noting that:
This definition sets out a quantitative test. If a pumping well depletes a stream by a tenth of a percent within a hundred years' time, ... then it's tributary. That part of the definition is statewide. ...

Then you get to the part of it that's specific to the Denver Basin: the Dawson, Denver, Arapahoe, Laramie-Fox Hills. It says that you disregard the artesian pressure that might exist in those formations, and you assume water table conditions exist in those formations when you determine whether they're tributary or not.
See id. (emphasis added).
Mr. Harrison also explained the augmentation requirements of Senate Bill 5 for nontributary and "not nontributary" wells. Like the definitional subsection at (10.5), the augmentation provisions at sections 37-90-137(9)(b) and (c) referred only to "the Dawson, Denver, Arapahoe, and Laramie-Fox Hills aquifers." § 37-90-137(9)(b), (c), C.R.S. (1999). They made no express mention of the Denver Basin.[17] After detailing the rules *273 for augmentation, Mr. Harrison told the representatives: "Again let me put this overall perspective on it. These specific rules apply only to the Denver Basin formations. You have one rule for the Dawson, the upper one. You have another rule for the lower three formations." See Hearing on SB 5 Before the House Committee on Agriculture, Livestock, and Natural Resources, 51st General Assembly, 1st Reg. Sess. (May 8, 1985) (emphasis added).
Thus, in the House as in the Senate, it is clear that legislators intended the enumeration of the four aquifers in Senate Bill 5 to apply only to formations of those aquifers located in the Denver Basin.[18] In fact, it appears that the legislators treated the phrase "the Denver Basin" interchangeably with the enumeration of the "Dawson, Denver, Arapahoe, and Laramie-Fox Hills aquifers." As such, we must apply these terms in accordance with their common usage in the legislative context. See § 2-4-101.[19]

V.
Furthermore, the General Assembly's enactment of subsection (10.7) in 1996 defining "not nontributary" also supports the notion that they intended the enumeration of the four aquifers to apply only in the Denver Basin. See An Act Concerning Augmentation Requirements for Water Well Pumping in the Denver Basin Aquifers, §§ 37-90-103, -137, -137.5, 1996 Colo. Sess. Laws 1360, 1360-65 (Senate Bill 96-074). Senate Bill 96-074 added subsection (10.7) defining "not nontributary," called for mandatory augmentation of "not nontributary" wells, revised subsection (10.5) to insure continued augmentation of such wells even after the ground water they withdrew became nontributary, and finally, provided for the creation of a special water committee to study groundwater management in the Denver Basin. See id. Each of these additions was consistent with the General Assembly's treatment, eleven years prior, of the four enumerated aquifers.
Indeed as the title of the 1996 Act itself demonstrates  "An Act Concerning Augmentation Requirements for Water Well Pumping in the Denver Basin Aquifers"  the General Assembly intended that the entire act apply only to the Denver Basin. See id.
Within the statute itself, the General Assembly also expressly used the term "Denver *274 Basin" interchangeably with the enumeration of the four aquifers.[20] For example, in defining "not nontributary," the General Assembly listed the four aquifers rather than using the phrase "the Denver Basin." See § 37-90-103(10.7). However, immediately prior to this definition, in noting that "not nontributary" water shall not be redesignated nontributary simply because pumping activity causes an aquifer's hydrostatic pressure to drop below the alluvium of an adjacent stream, the General Assembly referenced only water in the "Denver Basin." See § 37-90-103(10.5). Thus, it appears that the General Assembly intended the terms to be synonymous.

a.
Because of that use of terminology, we do not find the 1996 amendments themselves ambiguous. However, because we found ambiguity in subsection (10.5), we have looked to the legislative history of the subsection (10.7) amendment as well in order to determine whether we have reached the right conclusion. Legislative history also directly supports the notion that the General Assembly intended the specific phrase "not nontributary" to apply solely to the Denver Basin.
Testifying before the Senate Agriculture Committee, Assistant State Engineer Steve Lautenschlager explained the origins of the term "not nontributary":
The nontributary water prior to 1985 in Senate Bill 5 is really not well-defined. In 1985, after Senate Bill 5, defines what nontributary ground water was.
It also defines certain standards for appropriation of nontributary ground water and any water in the Denver Basin aquifers and also the Dakota aquifer at that time.
It was at that time that the term not nontributary was really coined in the legislation, specifically regarding only the Denver Basin aquifers. What it really meant was you have nontributary ground water which is well-defined by specific definition and then anything else in the Denver Basin aquifers, any other water that wasn't nontributary was defined as not nontributary ground water.

Hearing on SB 96-074 Before the Senate Committee on Agriculture, Natural Resources, and Energy, 60th General Assembly, 2d Reg. Sess. (Jan. 24, 1996) (emphasis added). Three months later, State Engineer Hal Simpson attempted to clarify the term "not nontributary" before the House Agriculture Committee:
Not nontributary is a very confusing term. It applies specifically to the Denver Basin aquifer where the effect of pumping is greater than one-tenth of one percent. So it doesn't meet the nontributary definition.
And in 1985, in those areas, the statutes said replace four percent of your depletions. So it deals with the very specific geologic area and geographical area dealing with how you replace depletions, four percent.
Hearing on SB 96-074 Before the House Committee on Agriculture, Livestock, and Natural Resources, 60th General Assembly, 2d Reg. Sess. (Apr. 25, 1996).
These statements indicate that, as in Senate Bill 5, the General Assembly understood its 1996 enumeration of the "Denver, Dawson, Arapahoe, and Laramie-Fox Hills aquifers" to apply solely to the Denver Basin.

VI.
We also note that the interpretation we reach today is consistent with this court's prior interpretations of the CGWMA. In Danielson, we observed that the "Dawson, Denver, Arapahoe and Laramie-Fox Hills aquifers are referred to as the Denver Basin aquifers."[21] We further stated that:
The General Assembly, in enacting Senate Bill 5, addressed the state's need for comprehensive regulation of nontributary ground water occurring outside of designated ground water basins. In addition to *275 providing for the administration of nontributary ground water, the General Assembly provided in Senate Bill 5 that Denver Basin ground water would be subject to a separate regulatory scheme and set forth statutory mandates to guide the administration of rights to Denver Basin ground water. See §§ 37-90-103(10.5), -137(4).
791 P.2d at 1110-11 (citation omitted). We reiterated this observation last year in Chatfield E. Well Co., Ltd., v. Chatfield East Property Owners Ass'n, 956 P.2d 1260 (Colo. 1998), noting that "[b]y means of Senate Bill 5, the General Assembly subjected Denver Basin ground water ... to the separate water use system of section 37-90-137(4) and required the State Engineer to promulgate rules for use of this water under section 37-90-137(9)(b)." Id. at 1270 (citation omitted).
Consistent with these prior decisions, we now hold that, as it pertains to the CGWMA, the phrase "Denver, Dawson, Arapahoe, and Laramie-Fox Hills aquifers" applies only to formations of these four aquifers that are located in the Denver Basin. We therefore affirm the ruling of the water court in this regard.
However, we do not agree with the water court's determination that because the ground water at issue is tributary absent the provisions of subsections (10.5) and (10.7), PCSR must replace 100% of its out-of-priority withdrawals. We rejected the notion that users of tributary ground water must replace 100% of their withdrawals in Cache La Poudre Water Users Ass'n v. Glacier View Meadows, 191 Colo. 53, 550 P.2d 288 (1976). In that case, we held that "water is available for appropriation if the taking thereof does not cause injury" and that "where senior users can show no injury by the diversion of water, they cannot preclude the beneficial use of water by another." Id. at 62, 550 P.2d at 294. This rule serves to ensure the maximum utilization of the tributary waters of this state, in accordance with Article XVI, Section 6 of the Colorado Constitution. See Fellhauer v. People, 167 Colo. 320, 447 P.2d 986, 994 (1968).

VII.
We thus reverse the water court with respect to its determination that PCSR must augment 100% of its out-of-priority withdrawals. We affirm the water court's ruling that the hydrostatic pressure assumption in subsection (10.5) and the "not nontributary" provisions of subsection (10.7) do not apply to aquifers outside the Denver Basin. Thus, PCSR is entitled to pursue water rights to the ground water beneath its lands in South Park pursuant to the doctrine of prior appropriation in accordance with the Water Right Determination and Administration Act of 1969, but, to the extent that it makes out-of-priority diversions, it must avoid material injurious depletions to senior surface rights.
NOTES
[1] After this ruling, the State Engineer issued a third amended determination of fact, finding that all of the ground water in question was tributary when considered without the hydrostatic pressure assumptions set forth in subsection (10.5) or the "not nontributary" classification of subsection (10.7).
[2] We have direct appellate review jurisdiction over water adjudications pursuant to Colo. Const. art. VI, § 2(2), section 13-4-102(1)(d), 5 C.R.S. (1998), and C.A.R. 1(a)(2). See Las Animas Consol. Canal Co. v. Wagner, 688 P.2d 1102, 1105 n. 5 (Colo.1984).
[3] As to this second point, the Colorado Attorney General's Office has filed a brief on behalf of the State Engineer, an appellee in this case, pursuant to C.A.R. 1(e). The Attorney General's brief is in accord with the position of PCSR on the augmentation issue. As to PCSR's first point, during oral arguments on this case, Edward Kowalski, an Assistant Attorney General, indicated that the State Engineer is in agreement with the water court's rulings with respect to subsections (10.5) and (10.7).
[4] See Whitten v. Coit, 153 Colo. 157, 174, 385 P.2d 131, 140 (1963); Colo. Const. art. XVI, § 5. But see § 37-92-602(1), 10 C.R.S. (1998) (exempting certain types of wells into tributary ground water from administration under the Water Right Determination and Administration Act of 1969, see §§ 37-92-101 to -602, 10 C.R.S. (1999)).
[5] See, e.g., City & County of Denver v. Colorado River Water Conservation Dist., 696 P.2d 730, 745-46 (Colo.1985).
[6] See §§ 37-92-306 and -401(1)(b), 10 C.R.S. (1998).
[7] See Ripley v. Park Ctr. Land & Water Co., 40 Colo. 129, 133, 90 P. 75, 76 (1907).
[8] See Colorado v. Southwestern Colo. Water Conservation Dist., 671 P.2d 1294, 1318 (Colo.1983).
[9] See Navajo Dev. Co., Inc., v. Sanderson, 655 P.2d 1374, 1377 (Colo.1982).
[10] See §§ 37-90-102(2); XX-XX-XXX(10.5), (10.7); XX-XX-XXX(4); Bayou Land Co. v. Talley, 924 P.2d 136 (Colo.1996); see also American Water Dev. v. City of Alamosa, 874 P.2d 352, 369 (Colo.1994) (observing that the "right to withdraw nontributary water is based on ownership of the overlying land").
[11] In 1973, in Senate Bill 213, the General Assembly created the Colorado Ground Water Commission (CGWC) to administer "designated ground water basins." See §§ 37-90-106; XX-XX-XXX(5), (6), (7). Approximately 49% of the eastern portion of the Denver Basin is classified as "designated groundwater" and is administered by CGWC. Such water falls within a modified doctrine of prior appropriation regime that is distinct from the statutory framework applicable to this case. See §§ 37-90-107, -109.
[12] In Danielson, we noted that expert testimony established that "if you assume that the hydrostatic pressure level is at the top of the aquifer, predictions on the effect of ground water withdrawal on a surface stream will show a less immediate effect than if the natural aquifer conditions are used in the calculations." Danielson, 791 P.2d at 1111-12 (footnote omitted). Thus, the hydrostatic pressure assumption in section 37-90-103(10.5) operates to classify the four named aquifers as nontributary under hydrological conditions that otherwise would cause the water to be defined as tributary.
[13] See § 37-90-137(9)(c)(I). To study the effect of these augmentation requirements on future water supplies and existing water rights, and to make recommendations for possible statutory changes, the General Assembly authorized the creation of a Special Water Committee in 1996. See § 37-90-137.5(4)(g). The General Assembly renewed this legislation earlier this year. See An Act Concerning Augmentation Requirements for Water Well Pumping in the Denver Basin Aquifers, § 37-90-137.5, 1999 Colo. Sess. Laws 670, 670-671.
[14] Furthermore, because well pumping itself will eventually lower the water level in a "not nontributary" artesian aquifer, causing it to lose its hydrostatic head and thus to perhaps become over time truly "nontributary," subsection (10.5) also provides that:

not nontributary ground water, as defined in subsection (10.7) of this section, in the Denver basin shall not become nontributary ground water as a result of the aquifer's hydrostatic pressure level dropping below the alluvium of an adjacent stream due to Denver basin well pumping activity.
The effect of this provision, and similar provisions in section 37-90-137(9)(c)(I), is to require users of "not nontributary" water in the Dawson, Denver, Arapahoe, and Laramie-Fox Hills aquifers to continue to augment water back to the stream even after their pumping activity has rendered their aquifer nontributary. In this manner, to the extent that the withdrawal of water in these aquifers affects vested tributary rights, those rights are protected by stream augmentations. Augmentation requirements may continue even after pumping activity has ceased. See § 37-90-137(9)(c)(I).
[15] In 1978, John Huston and three other unrelated parties filed 122 applications in water courts throughout Colorado for over 20 million acre feet of non-designated ground water based on the doctrine of prior appropriation. See Southeastern Colo. Water Conservancy Dist. v. Huston, 197 Colo. 365, 369, 593 P.2d 1347, 1349 (1979) (Huston I); Brett Heckman, Comment, Principles & Law of Colorado's Nontributary Ground Water, 62 Denver. U.L.Rev., 809, 821 (1985). In Huston I, we considered a C.A.R. 21 original proceeding arising from the resulting cases, and ordered their consolidation before a single water judge for purposes of resolving certain common questions of law.
[16] In the 1965 enactment of the CGWMA, the General Assembly included a provision requiring permits for new wells or increased usage of existing wells outside of designated ground water basins. See ch. 319, sec. 1, § 148-18-36, 1965 Colo. Sess. Laws 1246, 1266-67. In 1973, the General Assembly amended this provision when it passed Senate Bill 213, which limited withdrawals of nontributary ground water to the amount of water underlying the well owner's land, with additional rationing provisions to ensure a 100 year aquifer life. See ch. 441, sec. 1, § 37-90-137(4), 1973 Colo. Sess. Laws 1520.
[17] In relevant part, section 37-90-137(9)(b) states:

[T]he state engineer shall promulgate reasonable rules and regulations applying exclusively to the Dawson, Denver, Arapahoe, and Laramie-Fox Hills aquifers to the extent necessary to assure that the withdrawal of ground water from wells described in subsection (4) of this section will not materially affect vested water rights to the flow of any natural stream. In no event shall the rules and regulations promulgated under this paragraph (b) require that persons who withdraw nontributary ground water, as defined in section 37-90-103(10.5), relinquish the right to consume, by means of original use, reuse, and successive use, more than two percent of the amount of such ground water which is withdrawn without regard to dominion or control of the ground water so relinquished....
§ 37-90-137(9)(b). Again in relevant part, section 37-90-137(9)(c) states:
As to wells which will be completed in the Dawson, Denver, Arapahoe, and Laramie-Fox Hills aquifers and will withdraw ground water that is not nontributary ground water, ... judicial approval of plans for augmentation shall be required prior to the use of such ground water. As to such wells completed in the Dawson aquifer, decrees approving such plans for augmentation shall provide for the replacement of actual stream depletion to the extent necessary to prevent any injurious effect, based upon actual aquifer conditions in existence at the time of such decree. As to such wells completed in the Denver, Arapahoe, or Laramie-Fox Hills aquifers more than one mile from any point of contact between any natural stream including its alluvium on which water rights would be injuriously affected by any stream depletion, and any such aquifer, such decrees shall provide for the replacement to the affected stream system or systems of a total amount of water equal to four percent of the amount of water withdrawn on an annual basis. As to such wells completed in such aquifers at points closer than one mile to any such contact, the amount of such replacement shall be determined using the assumption that the hydrostatic pressure level in each such aquifer has been lowered at least to the top of that aquifer throughout that aquifer....
§ 37-90-137(9)(c).
[18] PCSR contends that the testimony of Harold Miskel on behalf of the Colorado Water Congress in front of the House Agriculture Committee during that Committee's consideration of a separate bill indicates that the House was aware that the Laramie-Fox aquifer exists throughout the state. The bill in question, House Bill 1173, as originally introduced, proposed designating the Laramie-Fox Hills aquifer wherever it did not overlay the Denver, Arapahoe, or Dawson-Arkose aquifers. Mr. Miskel testified that the bill, in that form

does not specifically limit the designation of the Laramie-Fox Hills to any specific area, such as the upper Crow Creek area, which seems to be the subject of primary concern and the motivations for the bill.
Now, the language, as written would provide for designation of the Laramie-Fox Hills formation anywhere in the state it would outcrop.... That essentially would allow the designation "nontributary" to occur in a rather wide ... banded circle around the Denver Basin, including a large portion of the Denver Metro area and the Colorado Springs area, up and down the front range where these formations outcrop.
See Hearing on HB 1174 Before the House Committee on Agriculture, Livestock, and Natural Resources, 51st General Assembly, 1st Reg. Sess. (Feb. 13, 1985). We find that this testimony is consistent with the notion that the House was aware of the fact that the Laramie-Fox Hills aquifer existed up and down the Front Range in the Denver Basin, but was unaware that a formation of the Laramie-Fox Hills existed in South Park. Notably, the Laramie-Fox Hills aquifer does exist, without overlap by other Denver Basin aquifers, in a band around much of the Denver Basin. See Metropolitan Water Supply Investigation Final Report to the Colorado Water Conservation Board 50 (January 1999) (Figure 7, Aquifer Map of the Denver Basin).
PCSR cites other legislative history indicating that the General Assembly was aware that nontributary ground water existed throughout the state, not simply in the Denver Basin, but we find these citations unpersuasive.
[19] Additionally, after the General Assembly enacted Senate Bill 5, the State Engineer promulgated augmentation rules pursuant to section 37-90-137(9)(b) that apply only to the Denver Basin. See Denver Basin Rules, 2 C.C.R. § 402-6, Rule 1.
[20] This usage contrasts with the express terms of the 1985 revisions to the CGWMA, which referred only once to the "Denver Basin." See § 37-60-115(3), 10 C.R.S. (1998).
[21] See Danielson, 791 P.2d at 1108 n. 3.