COLORADO GROUND WATER COM-
MISSION; and Hal D. Simpson, State
Engineer/Executive Director of the Col-
orado Ground Water Commission, De-
fendants–Appellants/Cross–Appellees,

and

Thomas H. Bradbury and Associated
Applicants, Defendants Below,

v.

NORTH KIOWA–BIJOU GROUNDWA-
TER MANAGEMENT DISTRICT,
Plaintiff–Appellee/Cross–Appellant.

No. 02SA216.

Supreme Court of Colorado,
En Banc.

Sept. 8, 2003.

Ken Salazar, Attorney General, Patrick Kowaleski, Assistant Attorney General, Water Rights Unit, Natural Resources and Environment Section Denver, Colorado, Attorneys for Defendants–Appellants/Cross–Appellees Colorado, Ground Water Commission; and Hal D. Simpson, State Engineer/Executive Director of the Colorado Ground Water Commission.

Hill & Robbins, P.C., David W. Robbins, Dennis M. Montgomery, Mark J. Wagner, Avi S. Rocklin, Denver, Colorado, Attorneys for Defendants Below Thomas H. Bradbury and Associated Applicants.

Epperson & McClary, Donald F. McClary, Andrew F. McClary, Fort Morgan, Colorado, Attorneys for Plaintiff–Appellee/Cross–Appellant North Kiowa–Bijou Groundwater Management District.

Justice BENDER delivered the Opinion of the Court.

## I. Introduction

In this ground water appeal, we construe and hold constitutional a recent amendment to the Colorado Ground Water Management Act (CGMA), § 37–90–107(7), 10 C.R.S. (2002) and implementing provisions (House Bill 98–1151), concerning the water right determination and administration of designated basin ground waters contained in the aquifers of the Denver Basin.

In this case, the Bradburys, owners of land located in the Kiowa–Bijou designated ground water basin, applied to the Ground Water Commission for a determination of the right to withdraw designated ground water of the Denver Basin aquifers underneath their lands. The North Kiowa–Bijou Ground Water Management District objected on multiple grounds.

On appeal from the administrative hearings and procedures of the Commission, the designated ground water judge[1] ruled that § 37–90–107(7) was constitutional and that the Bradburys need not submit their applications to the management district for approval as part of the Commission process to determine the Bradburys' right to withdraw the designated ground water. The judge construed subsection (7) of § 37–90–107 to grant the Commission the power to determine the amount of water underneath the Bradburys' land but not to determine the existence of a water right until a well permit was sought. The judge also ruled that the anti-speculation doctrine did not apply to the Commission's

determination of the landowner's right to withdraw ground water under subsection (7). However, in an earlier order, the judge entered findings of fact that the Bradburys' applications were not speculative. The Commission, the Bradburys and the District appeal the judge's rulings.

We affirm in part, reverse in part, and remand with specific directions.

■ First, we hold that House Bill 98–1151 does not violate Article XVI, sections 5 and 6 of the Colorado Constitution because the doctrine of prior appropriation does not apply to the allocation and administration of designated ground water located within the Denver Basin Aquifers. As is the case with nondesignated, nontributary water, the General Assembly exercises plenary authority over Denver Basin bedrock aquifer ground water. Hence, the legislative provision in question, which concerns the allocation and administration of designated Denver Basin ground water, is constitutional and we affirm the trial court on this issue.

Second, we reverse the ground water judge's construction of subsection (7). We hold that § 37–90–107(7) vests the Commission with the authority to determine a use right for the withdrawal of Denver Basin designated ground water by overlying landowners, or those acting with landowner consent, whose land lies within the boundaries of a designated ground water basin that is located in the Denver Basin. The Commission determines the applicant's use right. A use right is a specific entitlement to a quantity of Denver Basin ground water underneath the applicant's land which constitutes a final determination of the water right. The Commission retains authority, however, to adjust this amount to conform to the actual aquifer characteristics encountered upon drilling the well or test holes. The Commission's determination of this use right constitutes a final determination of the right, and the landowner need not drill a well to obtain this determination. The owner of land that both over-

---

[1] When an aggrieved party challenges the Commission's use right determination, the judge who hears the challenge is a district court judge designated by the Supreme Court whose judicial

district lies within the boundaries of the designated ground water basin. *See* § 37–90–115, 10 C.R.S. (2002).

lies the Denver Basin Aquifers and is located within a designated ground water basin possesses a statutorily-created, inchoate right to apply to the Ground Water Commission for the right to use the waters of the aquifers underneath his land by virtue of land ownership.

■ Third, we affirm the ground water judge and hold that the Ground Water Management Districts possess no statutory authority to determine an applicant's water use right under § 37–90–107(7). The District's regulatory authority begins once a permit has been issued. Hence, an applicant seeking the Commission's determination of its use right need not initially submit its application to the Water District for approval.

Fourth, because all water within this state, surface or ground water, is a public resource and no person owns the public's water, we reverse the ground water judge and hold that the anti-speculation doctrine applies to the Commission's determination of the applicant's right to use these waters. The applicant must establish a threshold showing that either there is a beneficial, non-speculative use that will not create unreasonable waste for the water on the applicant's land, or that the applicant has a contract with a private or public entity for the water's beneficial use if the use will occur on land other than the applicant's.

2. Section 7(a) provides:
The commission shall allocate, upon the basis of the ownership of the overlying land, any designated ground water contained in the Dawson, Denver, Arapahoe, or Laramie–Fox Hills aquifers. Permits issued pursuant to this subsection (7) shall allow withdrawals on the basis of an aquifer life of one hundred years. The commission shall adopt the necessary rules to carry out the provisions of this subsection (7).
Section 7(c)(I) states in relevant part:
Rights to designated ground water in the Dawson, Denver, Arapahoe, or Laramie–Fox Hills aquifers to be allocated pursuant to paragraph (a) of this subsection (7) may be determined in accordance with the provisions of this section. Any person desiring to obtain such a determination shall make application to the commission in a form to be prescribed by the commission.
Section 7(d) states in relevant part:

Lastly, we remand this case to the ground water judge with directions to reinstate his finding from his initial orders that the Bradburys' applications were not speculative and satisfied the anti-speculation doctrine. We then direct him to return the case to the Commission for further proceedings consistent with this opinion.

## II. Facts and Proceedings Below

The Bradbury family owns several parcels of land located within the boundaries of the Kiowa–Bijou Designated Ground Water Basin. These properties also overlie portions of the Denver, Arapahoe, and/or Laramie–Fox Hills Aquifers, which, together with the Dawson Aquifer, are collectively referred to as the Denver Basin Aquifers. Pursuant to House Bill 98–1151, newly codified in part as sections 37–90–107(7)(a),(c), and (d), 10 C.R.S. (2002) of the CGMA,[2] the Bradburys as landowners filed applications to the Commission for a determination of use rights to designated Denver Basin ground water underlying their land without seeking well permits.[3] The applications claimed future industrial, commercial, irrigation, stock, and domestic uses of the nontributary ground water underneath their land.

Commission staff made preliminary findings that certain amounts of designated ground water in the Denver Basin were available for allocation from the Denver aquifers and published the Bradburys' applica-

(I) Any person desiring a permit for a well to withdraw ground water for a beneficial use from the Dawson, Denver, Arapahoe, or Laramie–Fox Hills aquifers shall make application to the commission on a form to be prescribed by the commission.
(II) A well permit shall not be granted unless a determination of ground water to be withdrawn by the well has been made pursuant to paragraph (c) of this subsection (7).

3. The Colorado Ground Water Commission is a regulatory and an adjudicatory body authorized to manage and control designated ground water resources within the State of Colorado. The Ground Water Commission adopts rules and policies related to issuing large capacity well permits and changes in ground water rights within the Designated Ground Water Basins. *See* § 37–90–104; *State of Colorado: Ground Water Commission* (2002), *available at* http://www.water.state.ci,us.cgwc.

tions pursuant to § 37–90–107(2). In response, the North Kiowa–Bijou Groundwater Management District objected to the Bradburys' applications, arguing that the applicants failed to comply with the District's regulations by not submitting the applications to the District before submitting them to the Commission, and that the Bradburys' applications did not satisfy the anti-speculation doctrine.[4]

Pursuant to § 37–90–107(4), the District presented its objections to a hearing officer, who ruled that the Bradburys were not required to submit their applications to the District. The hearing officer held that the anti-speculation doctrine applies to a determination of use rights to designated Denver Basin ground water under § 37–90–107(7) and held a hearing to determine whether the Bradburys' applications satisfied this doctrine.

At the hearing, the Bradburys presented testimony from both experts and the landowners to prove that the intended uses of the water right were not speculative. A ground water geologist testified that the Bradburys' plan for development would use all of the available Denver Basin ground water under each parcel, and he opined that this proposed beneficial use would not result in waste. A land economist, who prepared the development options, testified that the Bradburys' plans were feasible in light of current and projected growth in the area. Landowner Thomas Bradbury testified that the applicants intended to use all of the Denver Basin ground water underlying their land for development purposes; that they did not intend to export or use any of it for another purpose; and that they had successfully developed other properties overlying the Denver Basin using ground water in the past.

The District failed to present any rebuttal evidence. Rather, the District argued that the evidence was insufficient as a matter of law because it established only general development options.

The hearing officer rejected this argument and entered the following findings of fact: (1) the applicants intended to use the water underlying each parcel of land to develop it; (2) the applicants did not intend to export any of the water outside of the designated basin or use it on other lands; (3) it was economically feasible for the applicants' lands to be fully developed within the next 20 years; (4) the quantities of ground water determined to be available would be necessary to develop the properties; and (5) the uses on the developed property would be the uses specified in the applications. The hearing officer then concluded that the Bradburys' applications were not speculative and granted them.

The District appealed to the Commission. The Commission affirmed the hearing officer's ruling that the Bradburys did not need to file their applications for determination of a use right with the Management District. In addition, the Commission concluded that, irrespective of whether the anti-speculation doctrine applies to the determination of a use right under 37–90–107(7), the Bradburys' applications were not speculative in light of the undisputed, uncontested evidence presented at the hearing.

The District then appealed the Commission decision to the designated ground water judge.[5] Initially, the ground water judge granted partial summary judgment for the Commission, ruling that § 37–90–107(7) and its implementing sections (House Bill 98–1151) did not violate Article XVI, sections 5

---

**4.** The CGMA provides that ground water management districts (GWMDs) can be created once a basin is designated, if the taxpaying electors in a designated basin so choose. *See generally* §§ 37–90–118 to –135. Management districts have the power to assist in the enforcement of Commission rules and may adopt their own rules subject to the Commission's review to administer ground water within their district. §§ 37–90–130 to –131. *Colorado Ground Water Comm'n v. Eagle Peak Farms, Ltd.*, 919 P.2d 212, 216 (Colo. 1996). Specifically, subsection 37–90–130(2) provides:

*After the issuance of any well permit for the use of ground water within the district by the ground water commission* as provided in sections 37–90–107 and 37–90–108, the district board has the authority to regulate the use, control, and conservation of the ground water of the district covered by such permit . . . . (emphasis added).

**5.** Section 37–90–115 allows any party to appeal *de novo* an adverse decision or act of the Commission.

and 6 of the Colorado Constitution, which guarantees the right to prior appropriation of surface and tributary waters because the legislature possesses plenary authority over the allocation and administration of designated ground water in the Denver Basin. Reasoning that § 37–90–107(7)(c)(I) requires applicants to submit applications for a determination of rights to the Commission and not the District, the ground water judge ruled that the District possessed no statutory authority to rule on the Bradburys' applications.

Acting upon the parties' stipulated facts that the evidence presented before the hearing officer on the anti-speculation doctrine would be treated as the only evidence on this issue, the judge ruled that the anti-speculation doctrine applied to a determination of a use right under § 37–90–107(7), and that the Bradburys' applications were in fact not speculative.

However, in a subsequent order, the ground water judge reversed part of his original orders. He concluded that § 37–90–107(7) granted authority to the Commission to determine only the quantity of water underneath the applicants' land and that subsection (7) did not grant the Commission authority to determine a water use right. Rather, he ruled that the water use right would be determined at a later time, when the Bradburys sought well permits, which they had not yet done.

▆ The Commission and the Bradburys now appeal to us, arguing the ground water judge's construction of § 37–90–107(7) was erroneous because this section confers on the Commission the power to determine a water right rather than simply to quantify the

amount of water underneath an owner's land.[6] The District appeals to us on all issues it raised before the ground water judge and the Commission. The Commission, which initially agreed with the Bradburys that the anti-speculation doctrine does not apply to the Commission's determinations of use rights, has changed its position and agrees with the District that it does.[7]

## III. Analysis

### Ground Water

Ground water supplies approximately eighteen percent of our state's water needs. Ralf Topper et al., *Colorado Geological Survey, Ground Water Atlas of Colorado* 1 (2003). Ground water, according to its lay definition, refers to water beneath the surface of the earth, as opposed to surface water. *Id.* at 15. It rarely exists in the form of underground lakes, streams or veins. Rather, it fills pores between rock grains in sedimentary rocks or in narrow crevices in crystalline rocks. These spaces, which can exist between rock and soil, such as pores between grains of sand and silt, between particles of clay, and along fractures of crystalline rock, represent a tremendous volume when taken in the aggregate. *Id.* An aquifer is a ground water reservoir composed of these saturated pores. *Id.* at 16.

▆ The General Assembly recognizes four categories of ground water: tributary ground water, designated ground water, nontributary ground water, and Denver Basin ground water. *See Upper Black Squirrel Creek Ground Water Mgmt. Dist. v. Goss,* 993 P.2d 1177, 1182 (Colo.2000). Tributary ground water is not visible from the earth's

---

6. We have direct appellate review jurisdiction over water adjudications pursuant to Colo. Const. art. VI, § 2(2), § 13–4–102(1)(d), 5 C.R.S. (2002), and C.A.R. 1(a)(2).

7. The Commission raises the following issue on appeal:

1. Does the owner of land overlying the Denver Basin aquifers of the designated basins have an inchoate water right in the water in those aquifers, without the issuance of a well permit?

The District cross-appeals the following issues:

1. Is § 37–90–107(7) C.R.S., H.B. 98–1151, "Amendment" to the Groundwater Management Act constitutional?
2. Did the Trial Court err in its ruling that the Anti–Speculation Doctrine did not apply to the initial proceedings and hearings under the provisions of § 37–90–107(7) C.R.S.?
3. Did the Trial Court err in its ruling that the subject applications should not have been first submitted to the District for action under its Rules and Regulations?
4. These proceedings under § 37–90–107(7) C.R.S., being subject to the Anti–Speculation Doctrine, the Court erred in its finding that the subject Applications were not speculative.

surface, but is hydraulically connected to the surface waters of a stream. *See Simpson v. Bijou Irrigation Co.*, 69 P.3d 50, 59 n. 7 (Colo.2003).[8] Because tributary ground water is connected to surface waters, use of this ground water may reduce available surface water that decreed appropriators would otherwise be able to divert in order of priority. *Id.* Thus, it is classified as if it were surface water, and like surface water, it is subject to the constitutional right of prior appropriation as provided in Article XVI, sections 5 and 6 of the Colorado Constitution and its implementing statutes. *See* § 37–92–102.[9] All ground water in Colorado, but not Denver Basin ground water, as we discuss below, is presumed to be tributary absent clear and convincing evidence to the contrary. *See Bijou Irrigation Co.*, 69 P.3d at 59 n. 7; *Safranek v. Town of Limon*, 123 Colo. 330, 334, 228 P.2d 975, 977 (1951). Rights to tributary ground water and surface waters are determined by Colorado's water courts and administered by the state engineer. *See* §§ 37–92–201 to –305.[10]

■ Designated ground water, nontributary ground water, and Denver Basin ground water are similar in character in that they are not hydraulically connected to the flow of a natural surface stream. These categories of ground water are allocated and administered pursuant to the General Assembly's plenary authority over ground water that is not tributary to a natural stream. *See, e.g.,*

*Upper Black Squirrel Creek*, 993 P.2d at 1182–1183; *Chatfield E. Well Co., Ltd. v. Chatfield E. Prop. Owners Ass'n*, 956 P.2d 1260, 1273 (Colo.1998). Below, we focus only on these three legislative categories of ground water, and briefly describe how each is allocated and regulated.

### Designated Ground Water

■ The General Assembly in 1965 classified designated ground water as ground water located within the boundaries of a designated ground water basin. Section 37–90–103(6)(a), defines designated ground water as:

> ground water which in its natural course would not be available to and required for the fulfillment of decreed surface rights, or ground water in areas not adjacent to a continuously flowing natural stream wherein ground water withdrawals have constituted the principal water usage for at least fifteen years preceding the date of the first hearing on the proposed designation of the basin[.]

Any ground waters of the four Denver Basin aquifers that lie "outside the boundaries of any designated ground water basin that was in existence on January 1, 1983" are not included in this definition. *Id.* Designated ground water is to be allocated and administered by the Ground Water Commission according to the statutory doctrine of modified prior appropriation.[11] Ch. 319, sec. 1, § 148–

8. Tributary ground water or underground water is defined by subsection 37–92–103(11) as "the waters of a natural stream . . . in the unconsolidated alluvial aquifer of sand, gravel, and other sedimentary materials and all other waters hydraulically connected thereto which can influence the rate or direction of movement of the water in that alluvial aquifer or natural stream."

9. This doctrine is based upon the theory that the first appropriator to divert and apply unappropriated water to a beneficial use is entitled to use and continue this beneficial use against all later appropriators. Priority for purposes of administration among respective users is a function of the appropriation date, or the date that the appropriator first formed the intent to divert the water to beneficial use and began work toward that end (the first step), and the calendar year the appropriator filed for the determination of the water right. *See In re Application for Water Rights of Vought*, 76 P.3d 906, 911, 2003 WL 21380384, at *4 (Colo.2003); *Water Rights of*

*Park County Sportsmen's Ranch LLP v. Bargas*, 986 P.2d 262, 265 (Colo.1999).

10. For a full discussion of the passage of the Ground Water Management Act in 1965 and the comprehensive legislation passed in 1969 "to integrate the appropriation, use and administration of underground water tributary to a stream," *see Simpson v. Bijou Irrigation Co.*, 69 P.3d 50, 60 (Colo.2003) (quoting § 37–92–102(1)(a)).

11. Modified prior appropriation "permit[s] the full economic development of designated ground water resources. Prior appropriations of ground water should be protected and reasonable ground water pumping levels maintained, but not to include the maintenance of historical water levels." § 37–90–102(1); *see also* James N. Corbridge, Jr. & Teresa A. Rice, *Vranesh's Colorado Water Law* 80–85 (rev. ed.1999); Brett Heckman, *Principles & Law of Colorado's Nontri-*

18–2, 1965 Colo. Sess. Laws 1246, 1247. However, as we address in detail below, in 1988 the General Assembly changed the Denver Basin allocation scheme so all Denver Basin ground water, including designated Denver Basin ground water, is to be allocated on the basis on overlying land ownership.[12]

### Nontributary Ground Water Located Outside of a Designated Ground Water Basin

The second classification of ground water, nontributary ground water located outside of designated ground water basins, although basically similar in character to designated ground water, is defined, allocated, and administered differently.[13] This category, sometimes called nontributary, nondesignated ground water, is "ground water, located outside the boundaries of any designated ground water basins ... the withdrawal of which will not, within one hundred years, deplete the flow of a natural stream ... at an annual rate greater than one-tenth of one percent of the annual rate of withdrawal." § 37–90–103(10.5). The determination of whether ground water is nontributary is based on aquifer conditions existing at the time of a well permit application or court adjudication. *Id.*

■ Unlike designated ground water, which is allocated according to the modified appropriation system, nontributary, nondesignated ground water is allocated on the basis of overlying land ownership. *See* § 37–

90–102(2). This allocation scheme governs the water court's determination of a land owner's right to use the ground water underneath her land. Because the substantive basis and procedure for allocating this water now parallels that used to allocate designated ground water in the Denver Basin, we explain it in some detail here.[14]

■ To obtain a use right for nontributary, nondesignated ground water, an overlying landowner can either seek a decree from the water court to determine a right to withdraw a quantity of ground water or apply to the state engineer for a well permit. *Bayou Land Co. v. Talley*, 924 P.2d 136, 147–49 (Colo.1996); *see also* § 37–90–137(4),(6). In either case a permit is required to pump the water. *Bayou Land Co.*, 924 P.2d at 148 n. 18; § 37–90–137(4).

■ To obtain a decree from the water court, the court determines the amount of nontributary ground water outside of a designated ground water basin that the landowner may withdraw. The water court has authority to make this determination under § 37–92–203(1) of the Water Right Determination and Administration Act of 1969.[15] Such an adjudication by the water court creates a vested water use property right in the overlying landowner, subject to the water court's jurisdiction "as necessary to provide for the adjustment of the annual amount of withdrawal allowed to conform to actual local aquifer characteristics from adequate information obtained from well drilling or test holes." § 37–92–305(11).[16] The water use

*butary Ground Water*, 62 Denv. U.L.Rev. 809, 812–13 (1985).

**12.** *See* our discussion of House Bill 98–1151 below.

**13.** Although nontributary ground water was not statutorily defined until 1985 as part of Senate Bill 5, *see* ch. 285, sec. 2, § 37–90–103, 1985 Colo. Sess. Laws 1161, we defined it in our case law as early as 1975. *See Kuiper v. Lundvall*, 187 Colo. 40, 44, 529 P.2d 1328, 1331 (1975) ("We hold that as to the water taking over a century to reach the stream, the tributary character is *de minimus* and that this is not a part of the surface stream as contemplated by our Constitution."). The legislature established the right to withdraw nontributary, nondesignated ground water on the basis of ownership of the overlying land in 1973 when it passed Senate Bill 213. Ch. 441, sec. 1, § 148–18–36, 1973 Colo. Sess. Laws 1520.

**14.** In House Bill 98–1151, which we review in greater detail below, the General Assembly sought to empower the Commission with a process to determine a landowner's use right for designated ground water within the Denver Basin, thereby mirroring the process followed by the water court for non-designated groundwater outside the Denver Basin.

**15.** The decree need not include a date for the initiation of the withdrawal project, nor a finding of "reasonable diligence" on the part of the landowner in order for the project to commence. § 37–92–305(11).

**16.** Parenthetically, we note the portion of § 37–92–305(11) quoted here is virtually identical to the language of subsection (7)(c)(III) of § 37–90–107 giving the Commission the authority to make a final determination of the water to be with-

right may also vest if the landowner constructs a well in accordance with a permit from the state engineer. *Bayou Land Co.,* 924 P.2d at 149.

Whether the use right is determined by water court decree under § 37–92–305(11) or by obtaining a well permit from the state engineer under § 37–90–137(4) and drilling a well, the same withdrawal standards apply: withdrawals are allowed on the basis of an aquifer life expectancy of one hundred years, material injury to vested nontributary rights shall not be deemed to result from the reduction of either hydrostatic pressure or water level in the aquifer, and the amounts of withdrawal allowed by permit or decree shall be the same. *See* § 37–90–137(4) to (6); § 37–92–305(11). In addition, pursuant to the State Engineer Statewide Nontributary Ground Water Rules, the allowed average amount of withdrawal, exclusive of artificial recharge, cannot exceed one percent of the amount of water recoverable from the specific aquifer beneath the overlying land. 2 C.C.R. 402–7 § 8(A) (1999).[17]

Even without obtaining a vested right, either by water court decree or by drilling a well under permit conditions set by the state engineer, the landowner has a legislatively created, inchoate right that allows her "to control and use a specified amount of nontributary ground water." *Bayou Land Co.,* 924 P.2d at 149. Because this inchoate right exists under the statute by virtue of land ownership, it may be severed from the land by sale or consent. *Id.* However, the

legislature can modify or limit this inchoate right at any time before the water use right vests. *Id.* at 149 n. 20.

### Denver Basin Ground Water

The Denver Basin is a large kidney-shaped region measuring approximately 6,700 square miles in area with approximate boundaries stretching from Greeley on the north, Colorado Springs on the south, the front-range hogback on the west, and Limon on the east. Topper et al., *Ground Water Atlas of Colorado,* at 85–86. The basin is composed of four sedimentary rock and mostly confined aquifers, which lie underneath each other, separated by layers of impermeable materials. All four deep aquifers lie below the alluvial aquifer, which covers the entire surface area of the Denver Basin and may reach in places to a depth of one hundred and twenty-five feet. These deep aquifers descend in the following order by depth: Dawson, Denver, Arapahoe, and Laramie–Fox Hills aquifers, and vary in size and shape, with the deeper aquifers occupying larger areas. *Id.* Collectively, all four are referred to as the Denver Basin Aquifers by the General Assembly.[18] In *Water Rights of Park County Sportsmen's Ranch LLP v. Bargas,* 986 P.2d 262, 265 (Colo.1999), we held that although some of these aquifers may extend into other parts of the state, the legislature intended to provide for specific rules governing withdrawal of the deep waters from these four aquifers as they

drawn but to "retain jurisdiction for subsequent adjustment of such amount to conform to the actual local aquifer characteristics from adequate information obtained from well drilling or test holes."

17. We point out that this allocation system for nontributary, nondesignated ground water differs fundamentally from the prior appropriation system of tributary ground water and the modified appropriation system applied by the Commission in a designated ground water basin. Under prior appropriation and modified prior appropriation, beneficial use is the measure, scope, and limit of the water right. *See Santa Fe Trail Ranches Property Owners Ass'n v. Simpson,* 990 P.2d 46, 53–54 (Colo.1999).

18. It has been estimated that the Denver Basin in aggregate possesses an upper recoverable limit of 292 million acre feet in storage, which represents

about 1,200 times the volume of Dillon Reservoir. Topper et al., *Ground Water Atlas of Colorado,* at 93. However, new core hole data suggest that estimate could be reduced by one-third. *Id.* As of February 2001, approximately 33,700 wells have been completed in the Denver Basin aquifers. *Id.* at 95. Because pumping from these aquifers exceeds recharge in the Basin, it leads to mining of the water stored in the aquifer and may reduce discharge into rivers, streams, and lakes to the extent that there may be some hydraulic connection. *State v. Southwestern Colorado Water Conservation Dist.,* 671 P.2d 1294, 1313 (Colo.1983). Unlike surface water and tributary ground water, which are replenished seasonally by precipitation, the waters contained in the deep aquifers of the Denver Basin are subject to eventual depletion. *Id.*

exist in the Denver Basin only.[19] 986 P.2d at 275.

Our understanding of the allocation, administration, and management of the Denver Basin is complicated by the Basin's geography and by the statutory rules the General Assembly has adopted to classify Denver Basin ground water. First, a substantial portion of the eastern half of the basin lies within the boundaries of four designated ground water basins.[20] As a consequence, the deep Denver Basin aquifers are administered and managed by different state entities depending upon whether the waters are located within or outside of a designated ground water basin.

Second, the General Assembly has enacted a relaxed formulation for determining whether Denver Basin ground water is tributary or nontributary. *See* § 37–90–103(10.5). For Denver Basin ground water, whether located inside or outside the boundaries of a designated basin, the legislature has statutorily mandated that the water contained in each aquifer is less hydraulically connected to the surface waters than it may be in fact. *See Park County Sportsmen's Ranch,* 986 P.2d at 266.[21] This relaxed standard for determining Denver Basin nontributary ground water is offset by the statutory requirement that the users of this water may consume only ninety-eight per cent of the water withdrawn to avoid material injury to vested surface rights. A user must relinquish to the stream system the right to consume two percent of the water withdrawn. *Id.* at 267; § 37–90–137(9)(b); 2 C.C.R. § 402–6, Rule 8 (1985).

 For nondesignated ground water located within the Denver Basin, the legislature adopted an additional modification of the rule distinguishing tributary from nontribu-

---

**19.** The General Assembly has classified the Denver Basin separately from the rest of the state's ground water because the discharge from the Denver Basin into surface streams is *de minimus,* while the economic importance of those waters is immense. In addition, it is both feasible and required that wells in the tributary portions of the Denver Basin fully augment the loss they cause to surface streams. *See* § 37–90–103(10.5).

**20.** The four designated ground water basins in the Denver Basin are: Kiowa–Bijou, Lost Creek, Upper Big Sandy, and Upper Black Squirrel Creek. In *Park County Sportsmen's Ranch,* we noted that approximately 49% of the eastern portion of the Denver Basin is classified as designated groundwater. 986 P.2d at 266 n. 11. The University of Denver Water Law Review estimates that "the rural eastern 47% of these [four] aquifers will remain within previously formed designated basins while the urbanized western 53% will remain undesignated." Veronica A. Sperling & David M. Brown, *Outline of Colorado Ground Water Law,* 1 U. Denv. Water L.Rev. 275, 278 (1998).

The General Assembly has prohibited the Commission from establishing any additional ground water basins overlying the Denver Basin. § 37–90–106(4).

**21.** To determine whether Denver Basin ground water is nontributary, the legislature has mandated that "it shall be assumed that the hydrostatic pressure level in each aquifer [of the Denver Basin] has been lowered at least to the top of that aquifer throughout that aquifer...." § 37–90–103(10.5). Absent this assumption, the Denver Basin aquifers would be considered to be under artesian conditions, or conditions under which the hydrostatic pressure exerted by an area of ground water forces it to overflow or to discharge into surface waters. *Danielson v. Castle Meadows, Inc.,* 791 P.2d 1106, 1111 n. 5 (Colo.1990); *Park County Sportsmen's Ranch,* 986 P.2d at 267. For example, when a well is drilled, if the ground water below is under artesian conditions, the water will rise naturally up the pump, past the level of the top of the aquifer, due to the hydrostatic pressure of the ground water. *See Danielson,* 791 P.2d at 1111.

The assumption in subsection (10.5) then, is that each aquifer is considered always to be under water table conditions, i.e. the hydrostatic pressure exerted by an area of ground water is insufficient to have an immediate effect on the surface waters. *See Park County Sportsmen's Ranch,* 986 P.2d at 267, n. 12. Hence, such ground water will not be considered to overflow into the surface waters. *See id.* Since ground water must be hydraulically connected to surface waters to be considered tributary in nature, the legislature has essentially mandated that Denver Basin ground water is nontributary when, without such an assumption, the water might be classified as tributary. *Id.* at 267 n. 12.

Parenthetically, we note that the legislative history of subsection 10.5 indicates that at the time, experts estimated that the *de minimus* discharge resulting from the aquifers' true hydrostatic pressure would amount to approximately 40,000 acre feet of ground water. *Id.* at 271–72. However, it was also understood that this amount would be at least partially offset by augmentation plans. *Id.* at 272. In order to avoid injurious effects to surface water rights, the legislature required these augmentation plans, which must be approved by a water court. § 37–90–137(9)(c)(I).

tary ground water.[22] Subsection 37–90–103(10.7) classifies withdrawals from these four aquifers that will deplete the flow of a natural stream within one hundred years at an annual rate of greater than one-tenth of one percent of the annual rate of withdrawal as not nontributary water. Hence, Denver Basin ground water, located outside of a designated basin, that is partially tributary because it does not satisfy the definition of Denver Basin nontributary ground water shall nevertheless be administered on the basis of land ownership as if it were nontributary, provided its use is augmented.[23]

**22.** As stated in § 37–90–103(10.5), the general rule is that ground water is considered nontributary when it is "located outside the boundaries of any designated ground water basin" and its withdrawal "will not, within one hundred years, deplete the flow of a natural stream ... at an annual rate greater then one-tenth of one percent of the annual rate of withdrawal."

**23.** In *Park County Sportsmen's Ranch*, 986 P.2d at 267, we explained the legislative classification of not nontributary Denver Basin ground water under subsection 37–90–103(10.7). As we have previously noted, approximately eleven years earlier the legislature had created a classification scheme for Denver Basin ground water that essentially allowed the waters in the aquifers to be nontributary even though their hydrostatic pressure in some areas of the aquifers caused discharge into surface waters. *See* § 37–90–103(10.5). The legislature followed this same rationale when defining not nontributary ground water located in the Denver Basin but outside any of its four designated ground water areas. *Park County Sportsmen's Ranch*, 986 P.2d at 267. This new class of ground water does not meet the standard of nontributary Denver Basin ground water, under § 37–90–103(10.5), even when applying the hydrostatic pressure assumption. Thus, absent this statute, this groundwater would be tributary and therefore subject to prior appropriation. *Id.* at 267.

However, to avoid injurious effects to surface water rights, the legislature requires a judicially approved augmentation plan prior to pumping not nontributary water. § 37–90–137(9)(c)(I); *see also Simpson v. Bijou Irrigation Co.*, 69 P.3d 50, 60–61 (Colo.2003). The augmentation plans are tailored to each aquifer and, depending on the actual aquifer conditions, may be as stringent, less stringent or more stringent, than the augmentation plans that would apply to tributary ground water under prior appropriation administration. *Park County Sportsmen's Ranch*, 986 P.2d at 267–68; *see also* § 137–90–137(9)(c.5)(I) (providing similar but slightly different requirements for augmentation of not nontributary

Whether portions of the Denver Basin aquifers lie underneath designated ground water basin areas, subject to Commission jurisdiction, or nondesignated areas, subject to either the jurisdiction of the state engineer or the water court, the allocation of Denver Basin ground water is subject to the same standard: withdrawals are based upon an aquifer life expectancy of one hundred years and the quantity of water available for withdrawal shall be that quantity of water underlying the land owned by the applicant or someone acting with her consent. § 37–90–137(4)(b)(I) & (II); § 37–90–111(5).[24]

ground water between July 1, 2003 and July 1, 2006).

By allowing such pumping of not nontributary ground water, the aquifer will eventually lose its hydrostatic head and thereby become truly nontributary. If this water were to be classified as nontributary, then it would lead to an increased mining effect and reduce discharge. To avoid this result, the General Assembly amended subsection (10.5) to require water courts to classify not nontributary water as not nontributary even after it has lost its hydrostatic head:

> [N]ot nontributary ground water, as defined in subsection (10.7) of this section ... shall not become nontributary ground water as a result of the aquifer's hydrostatic pressure level dropping below the alluvium of an adjacent stream due to Denver Basin well pumping activity. § 37–90–103(10.5).

Accordingly, as we pointed out in *Park County Sportsmen's Ranch*, "augmentation requirements for not nontributary water may continue after pumping has ceased." 986 P.2d at 267 n. 14 (quoting § 37–90–137(9)(c)(I)).

**24.** From 1965, when the General Assembly defined nontributary designated ground water, until 1988, when House Bill 88–1173 (codified at section 37–90–111(5)) was passed, Denver Basin ground water within a designated basin was allocated and regulated by the Commission pursuant to the doctrine of modified appropriation. House Bill 88–1173 was an effort to reconcile this inconsistency in the treatment of Denver Basin ground water. Three years earlier, Senate Bill 5, now codified in section 37–90–137(4)(a), stated "*any* ground water" within the Denver Basin was to be allocated and administered on the basis of a one-hundred year aquifer life and overlying land ownership. However, according to the sponsor of the 1988 amendment, Representative Carpenter, this result was not intended by Senate Bill 5. Rather, the reference to "any ground water" in the Denver Basin in section 37–90–137(4)(a) meant any *nondesignated* ground water. *Hearing on House Bill 88–1173, Before the House Committee on Agriculture, Livestock, and Natural Resources*, 56th General As-

## House Bill 98–1151

Even though allocation of nondesignated and designated ground water is based upon the same standard,[25] before passage of House Bill 98–1151, there were different administrative procedures for users, depending upon whether the well was located on land inside or outside the boundaries of a designated basin. To place House Bill 98–1151 in context, we provide an overview of these procedures and then explain the new legislative mandates contained in this bill.[26]

Before and after HB 98–1151, to determine the use right for Denver Basin nondesignated ground water, the landowner had a choice: either apply for a permit through the state engineer or seek an adjudication in water court.[27] Adjudication of nondesignated Denver Basin ground water enabled the landowner, or someone acting with her consent, to obtain a decree establishing a use right to withdraw water at a later time for a specific quantity of Denver Basin ground water underneath her land without first obtaining a permit from the state engineer and incurring the expense of drilling a well. *See* §§ 37–92–203(1), 305(11); § 37–92–302(2)(a)(b).

In contrast, a landowner located within a designated basin had to obtain a conditional permit from the Commission before constructing a well. Such a permit entitled the holder to pump a specified amount of water for an intended beneficial use subject to conditions specified by the Commission. To issue a conditional permit, the Commission was required to find that there was unappropriated water, that existing rights would not be unreasonably impaired, and that the intended use would not create unreasonable waste. § 37–90–107(1)–(3),(5).

Then, the conditional permit holder had to complete the well within a year of obtaining the conditional permit and file an affidavit of beneficial use within three years to obtain a final permit.[28] *See* § 37–90–108(1)–(3). During this well application process, much of the actual work of the Commission is performed by the state engineer, who acts as the Commission's executive director carrying out and enforcing the decisions, policies and orders of the Commission. *See* § 37–90–104(6). Once the conditional permit holder drilled the well and put the ground water to beneficial use, the Commission issued a final permit that contained the priority date of the well and specified the rate and volume of ground water to be pumped. *See* § 37–90–108(5).

Under the modified prior appropriation system, the Commission determined priority of claims based upon the order of appropriation.[29] Final permits granted by the Commission served an analogous function to that of absolute water decrees entered by water

semb., (hearing tape, February 3, 1988, 3:00 p.m.–3:15 p.m.).

Thus, the Denver Basin designated ground water was administered by the Commission for this three year period pursuant to the doctrine of modified appropriation. The purpose of the change in 1988 was to provide the Commission with the same ability to allocate and administer nontributary nondesignated Denver Basin ground water that the state engineer and the water court possessed to allocate and administer nontributary nondesignated ground water, that is, based upon a one hundred year aquifer life expectancy and overlying land ownership.

25. This was due to the 1988 passage of House Bill 88–1173, now codified at section 37–90–111(5).

26. Our review does not include every step a future well user must follow to include each step required by statute or state engineer rule. Rather, we provide only a general overview that highlights each process.

27. Parenthetically, we note that both the water court and the state engineer apply the same modified standards to determine this use right as stated in §§ 37–90–103(10.5) and (10.7) for the Denver Basin aquifers.

28. The Division of Water Resources has promulgated Rules and Regulations for Management and Control of Designated Ground Water which apply to all designated ground water including designated ground water located within the Denver Basin. Under these rules, for example, since the Kiowa–Bijou Basin is over-appropriated, a new appropriation will not be allowed unless accompanied by a Commission approved replacement plan. 2 C.C.R. 410–1, Rule 5.2.4.2 (1992).

29. *See* § 37–90–109. For all claims for beneficial use of designated ground water initiated after May 17, 1965, the Commission determines the priority date by relation back to the date that the appropriator filed for a conditional permit with the Commission.

courts. Veronica A. Sperling and David M. Brown, *Outline of Colorado Ground Water Law*, 1 U. Denv. Water L.Rev. 275, 283 (1998). Only upon the issuance of a final permit would the landowner be able to obtain a determination of his use right, at which time the use right will vest. *Thompson v. Colorado Ground Water Comm'n*, 194 Colo. 489, 498, 575 P.2d 372, 379–80 (1978).

Since 1988, with the passage of House Bill 88–1173, now codified at § 37–90–111(5), the allocation rules have been the same for designated and nondesignated Denver Basin ground water:

> Notwithstanding any other provision of this article, the commission shall allocate, upon the basis of ownership of the overlying land, any designated ground water contained in the Dawson, Denver, Arapahoe, or Laramie–Fox Hills aquifers. Permits issued pursuant to this subsection (5) shall allow withdrawals on the basis of an aquifer life of one hundred years. Ch. 258, sec. 1, § 37–90–111, 1988 Colo. Sess. Laws. 1238, 1238.[30]

However, before passage of House Bill 98–1151, there existed an anomaly between landowners in designated basins and those located outside of basin boundaries, who wished to obtain a use right determination. Landowners in designated ground water basins had to undertake a two-step permit process while landowners in nondesignated areas could obtain a determination from the water court without first drilling a well. As State Engineer Hal Simpson testified, "You have to file for a well permit, construct a well, and get a final permit. That's very cumbersome and you have to invest a lot of money constructing these wells." *Hearing on House Bill 98–1151, Before the House Committee on Agriculture, Livestock, and Natural Resources*, 61st General Assemb. (hearing tape, February 4, 1988, 3:30 p.m.).

The 1998 legislation, ch. 290, sec. 5, § 37–90–107, 1998 Colo. Sess. Laws 1211, 1216–18, corrected this anomaly by vesting the Commission with parallel authority to that of the water court. It added subsection (7) to the statutory section governing the Commission's authority to issue well permits for designated ground water. *See* § 37–90–107(7). This new subsection (7) applies to Denver Basin designated ground water by vesting the Commission with authority to determine "rights to designated ground water in the Dawson, Denver, Arapahoe, or Laramie–Fox Hills aquifers . . . ." § 37–90–107(7)(c)(I). It provides that "[a]ny such commission approved determination shall be considered a final determination of the amount of ground water so determined." § 37–90–107(7)(c)(III).

Before the Commission issues a conditional permit for designated Denver Basin ground water, the Commission must make a determination of the amount of Denver Basin ground water to be withdrawn. § 37–90–107(7)(d)(II).[31] When the Commission issues a permit for the amount of ground water determined, it retains jurisdiction to adjust this amount "to conform to the actual local aquifer characteristics . . . obtained from well drilling or test holes." § 37–90–107(7)(c)(III).

In addition, part of this new section provides that a final permit is not necessary for a well described in a conditional permit issued on or after July 1, 1991 to withdraw Denver designated ground waters. For these wells and conditional permits issued on or after July 1, 1991, if the well is in compliance with the permit conditions and statutory requirements, then the conditional permit shall be considered "a final determination of a well's water right . . . ." § 37–90–108(3)(a)(II).

For Denver Basin designated ground water wells described in conditional permits issued after July 1, 1991, the well owner need not file an affidavit of beneficial use three years after the issuance of the conditional permit as must a conditional permit holder in designated basins outside the Denver Basin. *See* § 37–90–108(2)(a). Instead, the owner must file a notice with the Commission of commencement of beneficial use thirty days

---

**30.** For the legislative history of this subsection, *see supra* note 24.

**31.** This differs from the nondesignated Denver Basin ground water as to which the well permit and the adjudication process are alternative means for determining the water use right.

after the first beneficial use of any water withdrawn. § 37–90–108(2)(d).

The plain wording of House Bill 98–1151 thus provided the Commission with new authority to determine the use right of Denver Basin designated ground water in the same manner that a water court would for nondesignated Denver Basin ground water. In addition, House Bill 98–1151 eliminated the two step Commission permit process, and the landowner need not construct a well to determine her use right.[32] As such, this legislation corrected the inconsistent treatment that existed between future well users in designated and nondesignated areas of the Denver Basin.

### Application

Before turning to a discussion of whether the anti-speculation doctrine applies to a determination of a use right to withdraw designated ground water in the Denver Basin, we first apply the ground water principles discussed in the preceding section and the plain meaning of House Bill 98–1151 to this case.

■ Initially, we address two arguments of error advanced by the District. First, we reaffirm our numerous decisions holding that the General Assembly possesses plenary authority to allocate and administer designated Denver Basin ground water without running afoul of the constitutional right to prior appropriation guaranteed by Article XVI, sections 5 and 6 of the Colorado Constitution. *See, e.g., Upper Black Squirrel Creek*, 993 P.2d at 1182; *Chatfield E. Well Co.*, 956 P.2d at 1273; *State v. Southwestern Water Conservation Dist.*, 671 P.2d 1294, 1318–19 (Colo. 1983); *Kuiper v. Lundvall*, 187 Colo. 40, 44, 529 P.2d 1328, 1331 (1974). House Bill 98–1151 represents a constitutional exercise of the legislature's plenary authority. Hence, we affirm the ground water judge on this issue.

■ Second, we affirm the ground water judge's ruling that the Bradburys need not seek approval from the Management District. The District's jurisdiction begins after the Commission has issued a permit, and that occurs after the Commission has determined the water right. The District possesses no jurisdiction with respect to the Commission's determination of the water use right. As provided by § 37–90–107(7)(c)(I), "Any person desiring to obtain such a determination [of a use right to designated ground water within the Denver Basin] *shall make application to the [C]ommission ....*" (emphasis added). Because there is no statutory basis for the District's claim and because the District's regulatory control starts after the Commission issues a permit and not before, we affirm the ground water judge on this issue.

■ Turning to the ground water judge's construction of § 37–90–107(7), we reverse. We hold that § 37–90–107(7) vests the Commission with the authority to determine a water use right for the withdrawal of designated Denver Basin ground water to overlying landowners, or those acting with landowner consent, provided that the land lies within the boundaries of a designated ground water basin located in the Denver Basin. The Commission determines the applicant's use right, that is, a specific entitlement to use a quantity of designated Denver Basin ground water underneath the land, which constitutes a final determination of the water right subject to the Commission's authority to adjust this amount to conform to the actual aquifer characteristics encountered upon drilling the well or test holes. *See* § 37–90–107(7)(d)(IV). In contrast to nondesignated Denver Basin ground water, a person may not obtain a conditional permit to drill a well from the Commission without first obtaining the Commission's determina-

---

**32.** As Representative Brad Young, Co–Sponsor of House Bill 98–1151 stated, "This [new bill] clarifies the provisions for new withdrawals and allows for the determination rights of such water without the necessity of constructing a well, and that's similar to what goes on outside the designated basins right now in the Denver Basin. It eliminates the requirements for final well permits for the wells since the appropriations are based upon land ownership and not beneficial use of water." *Hearing on House Bill 98–1151, Before the House Committee on Agriculture, Livestock, and Natural Resources*, 61st General Assemb., (hearing tape, February 4, 1988, 3:03 p.m.).

tion of the water use right under subsection (7). *See* § 37–90–107(7)(d)(II).[33]

■■■ In our view, the language of House Bill 98–1151 and the legislative history mandate our holdings. When this more recent change to the Commission's authority is considered with the change of allocation directed by the legislature ten years earlier in 1988, we conclude that the legislature intended to provide the same substantive rights and similar procedures for owners of overlying land throughout the Denver Basin to withdraw Denver Basin ground water, irrespective of whether their property lies within or outside a designated ground water basin. As a result, the Bradburys possess the same statutory right to withdraw ground water that Denver Basin landowners do with respect to nondesignated Denver Basin ground water underneath their property. Hence, the Bradburys, as did the landowners in *Bayou Land Company*, possess an inchoate right to apply for the right to use the designated Denver Basin ground water underneath their land. They do not need to seek a well permit to obtain this right. It is a right to apply for the determination of a water use right for Denver Basin ground water that is acquired under the statute by virtue of their land ownership. And, as in the case of landowners in nondesignated portions of the Denver Basin, this inchoate right may be severed from the land but does not vest until a

determination of a water use right is made pursuant to § 37–90–107(7).

### Anti–Speculation Doctrine

■■■ We next address the remaining issue of whether the anti-speculation doctrine applies to the Commission's determination of Denver Basin designated ground water rights under subsection (7). We hold that it does.

■■■ All water within Colorado is a public resource, and no person owns the public's water. Rather, persons may obtain rights of use under applicable provisions of law. *Upper Black Squirrel Creek*, 993 P.2d at 1181; *Farmers High Line Canal Reservoir Co. v. City of Golden*, 975 P.2d 189, 198 (Colo.1999); *Bayou Land Co.*, 924 P.2d at 146–47 (Colo. 1996). The administration of a water use right, as we have seen, depends upon the statutory allocation of the category of waters to which the right attaches. *See Chatfield E. Well Co.*, 956 P.2d at 1271. Even though Denver Basin ground water is allocated and managed differently from tributary surface waters, the CGMA mirrors the anti-speculation, beneficial use, and non-waste precepts of Colorado water law.[34] *Id.*

■■■ The anti-speculation doctrine precludes the appropriator who does not intend to put water to use for her own benefit, and has no contractual or agency relationship with one who does, from obtaining a water

**33.** Additionally, the Commission may require the applicant to include a replacement plan, if required by its rules, to replace any depletions in the alluvial aquifers caused by the withdrawal of ground water from any of the four Denver aquifers. *See* § 37–90–107(7)(d)(III), –107(7)(c)(I), and –107.5.

**34.** Beneficial use, as defined in the Water Right Determination and Administration Act of 1969, is "the use of that amount of water that is reasonable and appropriate under reasonably efficient practices to accomplish without waste the purpose for which the appropriation is lawfully made." 37–92–103(4), 10 C.R.S. (2002); *Santa Fe Trail Ranches Property Owners Ass'n v. Simpson*, 990 P.2d 46, 53 (Colo.1999) ("No person may appropriate more water than is necessary for beneficial use."). Although the 1969 Act applies only to water in or tributary to streams and does not apply to nontributary ground water, we noted in *State v. Southwestern Colorado Water Conservation District* that the General Assembly

applied the same definition of beneficial use to nontributary ground water:

> While the 1965 Act does not provide a definition of beneficial use, *see* section 37–90–103, the general assembly incorporated that term into the Act aware that it had a well-established place in the legal terminology relative to tributary water rights. Although the legislature was at liberty to adopt different restrictions on the use of nontributary ground water, it chose instead to apply the same concept of beneficial use to such waters.

671 P.2d at 1323.

Waste, defined in the CGMA, means "causing, suffering, or permitting any well to discharge water unnecessarily above or below the surface of the ground." 37–90–103(20).

At issue here is the applicability of the anti-speculation doctrine; beneficial use and waste are not in dispute.

use right.[35] In other words, a person who intends to hold the right only to sell it or dispose of it for profit in the future, rather than acquire it for the purpose of applying water to an identified beneficial use, is not entitled to a determination of a water use right. *Three Bells Ranch Assoc. v. Cache La Poudre Water Users Ass'n*, 758 P.2d 164, 173–74 n. 11 (Colo.1988). This doctrine was initially established in the context of tributary surface water rights. In the context of the CGMA, this doctrine embodies the conservation aspect of the twin statutory goals of development and conservation. *See* § 37–90–102(2) ("To continue the development of [nondesignated] nontributary ground water resources consonant with conservation shall be the policy of this state."). ·

In *Colorado River Water Conservation District v. Vidler Tunnel Water Co.*, 197 Colo. 413, 594 P.2d 566 (1979), we discussed this requirement of non-speculative intent with respect to tributary surface waters. In that case we reviewed an application for a conditional storage right under the Water Right Determination and Administration Act of 1969,[36] which planned use of a small percentage of the water to irrigate the applicant's own land but sought to sell the remaining water to unidentified municipalities, without a contractual or agency relationship, based upon assumptions of future population growth and need. *Id.* at 418, 594 P.2d at 569. We held that evidence of future needs and uses of ·water without contractual commitments to use any of the water was insufficient to show the intent to put the water to beneficial use. We concluded that "[o]ur constitution guarantees a right to appropriate, not a right to speculate.... To recognize conditional decrees grounded on no interest beyond a desire to obtain water for sale would—as a practical matter—discourage those who have need and use for the water from developing it." *Id.* at 417, 594 P.2d at 568.[37]

Although *Vidler* involved an appropriation of tributary water under the 1969 Act, which does not apply to designated ground water,[38] we held that the anti-speculation doctrine does apply to designated ground water—that is, to ground water located in a designated ground water basin but outside the boundaries of the Denver Basin. *Jaeger v. Colorado Ground Water Comm'n*, 746 P.2d 515 (Colo.1987). We concluded that the rationale supporting our decision in *Vidler* to apply the anti-speculation doctrine to surface water also applies to designated basin ground water. *Id.* at 522–23. Thus, a user within a designated basin, not located in the Denver Basin, must satisfy the anti-speculation doc-

---

**35.** We established the anti-speculation doctrine in *Colorado River Water Conservation District v. Vidler Tunnel Water Company*, 197 Colo. 413, 594 P.2d 566 (1979). However, twenty five years earlier we foreshadowed the *Vidler* holding when we rejected a claim that "mere speculators, not intending themselves to appropriate and carry water to a beneficial use or representing others so intending, can by survey, plat, and token construction compel subsequent bona fide appropriators to pay them tribute by purchasing their claims in order to acquire a right guaranteed them by our Constitution." *City and County of Denver v. Northern Colo. Water Conservancy Dist.*, 130 Colo. 375, 408, 276 P.2d 992, 1009 (1955).

**36.** §§ 37–92–101 to –602, 10 C.R.S. (2002).

**37.** After we decided *Vidler*, the legislature amended the definition of appropriation in the Water Right Determination and Administration Act of 1969 to recognize that no appropriation can be based on speculation. *See* ch. 346, sec. 5, § 37–92–103(3)(a), 1979 Colo. Sess. Laws 1366, 1368. This section provides that:

"Appropriation" means the application of a specified portion of the waters of the state to a beneficial use pursuant to the procedures prescribed by law; but no appropriation of water, either absolute or conditional, shall be held to occur when the proposed appropriation is based upon the speculative ·sale or transfer of the appropriative rights to persons not parties to the proposed appropriation, as evidenced by either of the following:

(I) The purported appropriator of record does not have either a legally vested interest or a reasonable expectation of procuring such interest in the lands or facilities to be served by such appropriation, unless such appropriator is a governmental agency or an agent in fact for the persons proposed to be benefited by such appropriation[.]

(II) The purported appropriator of record does not have a specific plan and intent to divert, store, or otherwise capture, possess, and control a specific quantity of water for specific beneficial uses.

**38.** *See State ex rel. Danielson v. Vickroy*, 627 P.2d 752, 757–58 (Colo.1981).

trine requirements to obtain a conditional permit to drill a well. *Id.* at 523.

Since our holding in *Jaeger* technically applied only to designated ground water located outside the boundaries of the Denver Basin and did not specifically address the Denver Basin designated ground water involved here, the Bradburys argue that the *Jaeger* rationale is inapposite. Because only the overlying landowner, or someone who has the landowner's consent, may obtain the use rights to the Denver Basin ground water underneath her property, the amount or quantity of ground water to be withdrawn is determined differently from the allocation system of modified prior appropriation applicable to the designated ground water involved in *Jaeger.* As a result, the Bradburys argue that the anti-speculation doctrine is neither needed nor justified. This argument is unpersuasive.

Because all Colorado water is a public resource and the right to acquire it is a use right, the landowner seeking to use Denver Basin ground water possesses only an inchoate, statutory right to apply to use the water located under her land. To suggest that the anti-speculation doctrine does not apply to these waters because use is limited to overlying owners of land, and excludes others who lack the owner's consent, disregards the goal of conservation and the public nature of this resource.

Ground water located in the four deep Denver Basin aquifers represents a finite, exhaustible public resource. If the rate of withdrawal is assumed to exceed the rate of recharge, then, as the statute assumes, withdrawals will lead to a reduction in aquifer storage and a diminished discharge to surface waters. *See Southwestern Colorado Water Conservation Dist.,* 671 P.2d at 1313 ("Nontributary ground water supplies ... may dwindle because water can be withdrawn from the aquifers in excess of the recharge rate, causing a 'mining condition.'"). Hence, there is a need to conserve this finite resource to offset the mining of the aquifers caused by pumping that may reduce discharge and deplete water storage.

As additional support, we note that surface waters are replenished annually, whereas pumping that exceeds recharge will eventually deplete the usable water in the Denver Basin Aquifers. *See, e.g.,* Brett Heckman, *Principles and Law of Colorado's Nontributary Ground Water,* 62 Denv. U.L.Rev. 809, 814 (1985). Thus, it would be logically inconsistent to apply this conservation doctrine to waters that are seasonably replenishable but not to waters that are finite and exhaustible. For these reasons, the *Vidler* and *Jaeger* rationales should apply equally to Denver Basin designated ground water.

This conservation doctrine should apply when the Commission fixes or quantifies the landowner's water use right. In other words, the anti-speculation doctrine applies when the Commission makes the final determination of the amount of ground water allocated to the use right, acting pursuant to the provisions of subsection (7). § 37–90–107(7)(c)(III); *Thompson,* 194 Colo. at 497, 575 P.2d at 378 ("[T]he extent of beneficial use and the measure of the water right is fixed at the time a final decree is entered.").

■ Thus, when the Commission determines a water use right to designated ground water in the Denver Basin under § 37–90–107(7), an applicant must establish a threshold showing that there exists a beneficial, non-speculative use for the amount of allocated designated Denver Basin ground water that will not create unreasonable waste. If the use will occur on land other than the applicant's, then the applicant must establish that the applicant has a contract or agency relationship with another entity for the water's beneficial use.

### Application

■ The evidence the Bradburys presented before the ground water judge supports the judge's initial findings of fact that their applications are not speculative: they intend to use the designated Denver basin ground water underlying each parcel of land they own to develop the land; they do not propose to use it elsewhere; all of the ground water available under the land is necessary to develop it; and it is economically feasible for the Bradburys to develop their properties. Because the Bradburys provided

a sufficient factual showing that their intended uses do not violate the anti-speculation doctrine, we direct the ground water judge to reinstate his earlier finding of fact on this issue.

## Conclusion

Based upon our above discussion we affirm in part, reverse in part, and remand this case to the ground water judge with directions to reinstate his findings in his initial order consistent with this opinion and then to return this case to the Commission for further proceedings consistent with this opinion.

Justice COATS, concurring in part and dissenting in part.

I concur in the majority opinion to the extent that it holds that the legislature has empowered the ground water commission to grant a vested right, to a limited amount of designated ground water, contained in the Dawson, Denver, Arapahoe, or Laramie–Fox Hills aquifers, based on ownership of the overlying land. I do not agree, however, that this case requires us to decide whether an overlying landowner's right to such a grant is limited by the anti-speculation doctrine or that the majority's conclusion about the applicability of the doctrine would be correct if it did. Nor do I see merit in the majority's elaborate dictum on the treatment of ground water generally in this jurisdiction. While writing a benchbook on ground water law may be of assistance to both judges and practitioners, it should not be confused with the creation of law by this court's resolution of actual cases and controversies. I fear that the kind of global summarization attempted by the majority runs the risk of reducing precision and obscuring important distinctions in an extremely complex and technical area of the law, and suggests the considered resolution of matters better subjected to the adversary process.

The case before this court involves only an application to the ground water commission, by an overlying landowner, for rights to designated ground water contained in the Dawson, Denver, Arapahoe, or Laramie–Fox Hills aquifers. It is well-established in this jurisdiction that ground water with no more than a de minimis impact on the natural streams is subject to the plenary authority of the General Assembly. The General Assembly has chosen to exercise that control by authorizing the commission to allocate designated ground water from those particular aquifers on the basis of overlying landownership, rather than by a system of appropriation. See § 37–90–111(5), 10 C.R.S. (2002). Both the language and history of HB98–1151 make clear that these overlying landowners, who therefore have the same inchoate right to this ground water, within designated ground water basins, as exists for overlying landowners of non-tributary ground water, see Bayou Land Co. v. Talley, 924 P.2d 136 (Colo.1996); compare § 37–90–102(1) with § 111(5), are similarly entitled to a determination of that right without automatically engaging the statutory requirements, and time constraints, for construction of a well and application of the water to a beneficial use. See § 37–90–107(3).

Barring slippage between the statutory definition of designated ground water and ground water recognized by this court to have a sufficiently de minimis impact on natural stream water (which is not claimed here), the legislature clearly had the authority to allocate designated ground water as it saw fit; and therefore the district court need not have sought a narrowing construction in order to preserve the statute's constitutionality. In view of the statute's reference to the commission's determination of "[r]ights to designated ground water," as well as our prior determination that rights to non-tributary water "vest" either upon construction of a well or upon adjudication of rights, see Bayou Land Co., 924 P.2d at 149, the commission's similar final determination of amount and allocation of designated ground water from the four named Denver Basin aquifers must also be treated as a vested right. As such it cannot be taken away by subsequent legislative action, although it is still subject to subsequent adjustment by the commission. See § 37–90–107(7)(c)(III). I believe the district court was entirely correct, however, in holding that the anti-speculation doctrine does not limit the commission's au-

thority to grant an application for a water right to an overlying landowner.

Initially, because even the majority agrees that the applicants have made a sufficient factual showing that the anti-speculation doctrine would not be violated by this application, the majority's determination that the doctrine applies will have no effect on resolution of the case before us. I would therefore leave for another day, when it actually matters, any resolution of this issue, about which the statutes are far from clear. I also, however, do not find persuasive the majority's determination that the anti-speculation doctrine applies.

The anti-speculation doctrine was developed as a judicial gloss on the requirement that water be put to a beneficial use in order to successfully acquire a water right through appropriation. The doctrine has since been codified as part of the statutory definition of "Appropriation." *See* § 37–92–103(3)(a). The designated ground water at issue in this case, however, is not allocated by appropriation, or even a statutorily modified appropriation system; and rights to it cannot be acquired except by the overlying landowner or with his consent. The very reasons for the doctrine's existence and for which we have applied it to applications for designated ground water, *see Jaeger v. Colorado Ground Water Comm'n,* 746 P.2d 515 (Colo.1987), therefore simply have no meaning with regard to post-1988 applications by overlying landowners for designated ground water contained in the Dawson, Denver, Arapahoe, or Laramie–Fox Hills aquifers.

Quite apart from the impossibility of interfering with other potential appropriators, the commission's final determination of an application for designated ground water contained in the Dawson, Denver, Arapahoe, or Laramie–Fox Hills aquifers does not even require a showing of beneficial use. Unlike all other designated ground water, HB98–1151 appears to require a separate application for a conditional permit to withdraw ground water from these four aquifers for a beneficial use and apparently places no time limit on such an application, construction of a well, or withdrawal. *Compare* § 37–90–107(7)(d) *with* § 107(3). With regard to withdrawal of designated ground water from these four aquifers, no notice of beneficial use is required until 30 days after the first beneficial use of any water withdrawn, § 37–90–108(2)(d), and unlike other wells, no final permit need be issued. § 108(3)(a)(II). Whether or not anti-speculation can have any significance with regard to this limited category of designated ground water, the statutory scheme strongly supports the district court's finding that anti-speculation does not limit the commission's final determination of the amount to which the overlying landowner is entitled.

I would resolve this appeal simply by holding that it was within the statutory authority of the commission to determine the amount of ground water to which the applicants were entitled, and that by making a final determination, the commission granted the applicants a vested right, subject to subsequent adjustment to conform to actual local aquifer characteristics. I therefore concur in part and dissent in part.